Mr. Justice Thacher
delivered the following dissenting opinion.
On the 1st day of May, 1844, John B. Nevitt filed his bill in chancery to enjoin the collection of a judgment at law, obtained by the Bank of Port Gibson against him. On the final hearing of the bill in chancery, the injunction, previously granted, was dissolved. From the decree of the chancellor, dissolving this injunction, an appeal was taken by Nevitt to this *532 court. Pending this appeal, a judgment of ouster and forfeiture was rendered in the circuit court of Claiborne county, against the Bank of Port Gibson, and James J. Person and James T. Marye were appointed trustees to collect the assets of the Bank of Port Gibson, in pursuance of the statute of 1843, authorizing proceedings against banks for the forfeiture of their charters. These trustees have entered their motion in this court, praying to be made parties defendant to the appeal of the said Nevitt, and for leave to defend the same.
The majority of the court have determined to grant the motion, but my views of the law compel me to dissent from their opinion.
Several points have been made in the argument of this cause, but I shall direct my inquiries to the comprehensive question, whether or not the rights and credits of a bank survive the judgment of forfeiture, authorized by the statute of 1843.
The power of the legislature to oust corporators of their franchises, and to continue the use of the franchises in other corporators, is not disputed by me. The principle was recognized in my opinion in the case of The Commercial Bank of Rodney v. The State, 4 S. & M. 483. But, from the best examination I have been able to bestow on the statute of 1843, and the rules of law applicable to it, I am forced to the conclusion that the rights and credits of the Bank of Port Gibson do not survive the judgment rendered against that bank. This question was not presented, nor was it considered by the court in the case of the Commercial Bank of Rodney.
The judgment against the Bank of Port Gibson is in the following words: “ That the said bank be, and is hereby ousted of all the liberties, franchises, and privileges, granted or conferred in, and. by the act of the legislature,” chartering the same; and that said liberties, privileges, and franchises, so forfeited, be seized into the hands of the state of Mississippi Subsequently to the rendition of this judgment, an order was made by the circuit court that James J. Person and James T. Marye, be appointed trustees of said bank, who are directed to execute bond, with approved security, in the penalty of twenty *533 thousand dollars, payable to the governor of the state, and his successors in office, conditioned as the statute directs.
. The statute upon which the foregoing judgment and order are founded, provides that, upon judgment of forfeiture against any bank, its debtors shall not be released by such judgment from their debts and liabilities to the bank, but that it shall be the duty of the court rendering such judgment, to appoint one or more trustees, to take charge of the books and assets of the same, to sue for and collect all debts.due such bank ; to sell and dispose of all property owned by such bank, or held by others for its use, and the proceeds to apply, as may hereafter be directed by law, to the payment of the debts of such bank; that the trustees shall give bond, with good and sufficient security to faithfully collect the assets of the bank, to sell and dispose of the property belonging to the same, and the proceeds, when collected, to pay over as may hereafter be directed by law.
The judgment and order of the court strictly follow the provisions of the statute. The judgment is not only an ouster of the corporators, but a total seizure of all the v liberties, privileges, and franchises of the bank, into the hands of the state. The corporation is dissolved, and utterly .extinct. The state has neither continued the franchises of the bank for the purpose of collecting its assets, nor has it conferred them upon a new corporation. The question now arises, what are the consequences of such a judgment? According to the unbroken current of authorities, both in England and the United States, upon the dissolution of a corporation, its real estate reverts to the grantor and his heirs; its personal estate vests in the people in this country, and, in England, in the crown; and the debts due to and from the corporation, are totally extinguished, so that neither the stockholders, nor the directors, nor trustees of the corporation, can recover or be charged with them, in their natural capacity. Levinz, 237; Owen, 73; 2 Anderson, 107; 1 Blackf. Ind. R. 267; 2 Bacon’s Abr. 32; 4 Comyn’s Dig. 273; 1 Bla. Com. 484; 2 Kyd on Cor. 516; 2 Kent’s Com. 307-309; Ang. & Ames on Cor. 513. In the case of The *534 Commercial Bank v. Samuel Lockwood's Administrator, 2 Harr. Del. R. 13, the court say: “ Lands and tenements and goods and chattels, are matters of substance; they are tangible; they have not merely an ideal being, but an actual existence, although they may be without an owner in being, or in expectancy. It is not essential to their existence that they should have an owner; they pass, on the civil death of a corporation, from its hands, but they are not annihilated; they still exist and continue in being, and may be occupied and used by those who may take possession of them, as they retain their being and remain the subjects of occupancy and possession ; the grantor of the lands can lay hold of them, and the state, through its proper agent, can take possession of the goods and chattels which belonged to such corporation. But such is not the character or condition of debts owing to such corporation; they are merely rights; things incorporeal, which rest in action; they. have ;ari ideal, but not an actual existence — they are neither tangible, nor the subjects of occupancy or possession. In all the books which treat of the civil death of a corporation, debts.are considered as not within the terms personal estate, or as embraced, within that general class, but when spoken of are distinguished from personal estate. They do not pass to the people in this country, nor to the crown in England, as is the case with the personal estate, that is, the goods and chattels; nor could the state or crown recover them by suit upon the dissolution of the corporation. They have not, like real or personal property, a necessary existence. It is essential, to the continuance of that existence which belongs to their condition, that there should be either in actual being, or in expectancy, with the possibility of an actual being, two parties — one to do, and another to accept the thing done — a debtor and a creditor — a payer and payee; and if the debtor or creditor, payer or payee, dies a natural or civil death, without a representative, or the possibility of a representative, the debt ceases to exist, and the obligation of payment is forever at an end. When the law speaks of a right or obligation as extinguished, it means that it is put out, taken away, destroyed. Coke Litt. 147, b; *535 1 Rolle’s Abr. 933. If one has a rent-charge, and buys the whole, or a part of the land from which it issues, the rent-charge is thereby extinguished. It cannot be revived, and the land is forever free and discharged from it. Coke Litt. 148, a. If a creditor accept from his debtor a security for his debt of a higher grade, the law holds the original debt to be extinguished. It is at an end, and can never be sued on. Yelv. 38; 6 Coke, 44, b; Powell on Cont. 254; Peters’s Cond. R. 290, notes. At common law, if a creditor makes his debtor his executor, the debt is extinguished, and will not revive on the subsequent death of such executor. 1 Atk. 461.”
A written opinion, by Chancellor Kent, on the statute of 1843, was read in the argument of this cause, and relied upon to show that the common law consequences of a dissolution of a corporation do not apply to the moneyed corporations of this country. A sufficient reply to Chancellor Kent’s writteryjjfrfSHiia^my be found in the printed commentaries of that di^iBcítiágfeqtrlR? on “ American Law,” vol. 2, p. 304, 307; following language: “ Civil corporations, the corporations of towns and cities, or primtg, as batmr anee, manufacturing, and other companies omlili^^^iiiu’e, subject to the general law of the land, ano^menabT judicial tribunals for the exercise and abuse of* According to the settled law of the land, where there is no special statute provision to the contrary, upon the civil death of a corporation, all its real estate remaining unsold, reverts back to the original grantor and his heirs. The debts due to and from the corporation are all extinguished. Neither the stockholders nor the directors, nor trustees of the corporation can recover these debts, or be charged with them in their natural capacity. All the personal estate of the corporation .vests in the people, as succeeding to this right and prerogative of the crown at common law.” In support of this position, he cites Edmunds v. Brown & Sillard, 1 Lev. R. 237; Co. Litt. 13 b.; 3 Burr. R. 1868; 1 Black. Com. 484; 2 Kyd. on Cor. 516; State Bank v. The State, 1 Black. Ind. R. 267. Many others of equal authority might be cited to the same point. From the *536 foregoing quotations, it must be seen that Chancellor Kent has included banks, insurance companies, and all other corporations in this country, as being subject to the common law consequences of a dissolution, when no special statutory provision is made to the contrary. I feel inclined to give more weight to the views of Chancellor Kent asa commentator upon American law, than to his private opinion read in this cause, more especially as the main point upon which this cause turns- was not considered by him.
Having shown the common law consequences which flow from the judgment rendered against the Bank of Port Gibson, the next question presented, is, can the trustees, appointed for that purpose, proceed to collect the rights and credits which were of the dissolved corporation 1 In order to effect this object, it must appear from the statute that the legislature has directed only a partial seizure of the franchises of the bank, and that the privileges of holding property, suing, and being sued, and of collecting and paying debts which belonged to the bank, are not to be seized into the hands of the state, but to be continued in the trustees directed to be appointed; for, if these franchises are seized into the hands of the state, it produces a total extinguishment of all the debts due to and from the bank, so that neither the franchises of the bank nor the power to enforce its obligations can be revived either by legislative enactment or the interposition of a court of law or equity. Willc. on Cor. 185. In the case of The Commercial Bank v. Lockwood’s Administrator, previously cited, the charter of the bank expired by limitation. Two years subsequently to that event, the legislature of Maryland passed an act declaring the corporation to be revived and continued from the date of the expiration of the charter, with the same powers, privileges, rights and immunities which had been granted by its original charter. Under this act of revival, the Commercial Bank issued a scire facias on a judgment obtained by the bank previously to ,the expiration of its charter, against Samuel Lockwood, to revive said judgment. Upon full consideration of the case, and a review of all the English and American authorities, the court decided, *537 that the act of the legislature, reviving the corporation, did not revive the judgment against Lockwood. The court also decided in general terms, that it was not in the power of the legislature, by renewing the charter of the bank, to revive the liabilities to the same. In the case of Fox v. Horah, 1 Ired. Eq. N. C. R. 358; Horah was the cashier of the State Bank, of North Carolina, and the notes discounted by the bank, were made payable to Horah as cashier, for the use and benefit of the bank. The bank held a note of Fox, and Horah sued on the note. While suit was pending, the charter of the bank expired by limitation; Horah, nevertheless, obtained his judgment at law against Fox, who then filed his bill in chancery, setting forth the dissolution of the corporation, and praying a perpetual injunction against the judgment at law. In defence of this bill Horah set up that the legal title to the judgment was not in the bank, but in himself, and that upon dissolution of the corporation, he became a trustee in equity for the creditors thereof. The cause was argued before that distinguished jurist, Judge Gaston, who, in a very elaborate and learned opinion, decided .that, notwithstanding the legal title to the note, and the judgment thereon was in Horah, the equitable interest was in the bank, and that the expiration of the charter of the bank so extinguished the debt due on the note and judgment against Fox, that the same could not be collected either at law or in equity. The consequences of a judicial seizure of all the franchises of a corporation are the same as those of a dissolution by expiration of charter. Kent’s Com. 2, 307; Ang. & Ames on Cor. 2d ed. 667; 1 Blackf. Ind. R. 267; 1 Black. Com. 484; Co. Lilt. 13 b.; 3 Burr. R. 1868; 2 Kyd on Cor. 516. These eminent authorities are deemed sufficient to establish the foregoing propositions.
In the written opinion of Chancellor Kent, cited in this cause, the case of Mumma v. The Potomac Company, 8 Peters R. 281, was claimed as an authority to show, that the death of a corporation no more impairs the obligation of its contracts than the death of a private person. From an examination of that case, it will be seen that Chancellor Kent has mistaken the prin *538 ciple there decided. The charter of the Potomac Company was never seized into the hands of the state, nor did it expire by limitation. But the legislature of Virginia, during the existence of said charter, incorporated the Chesapeake and Ohio Canal Company, conferring all the powers and rights of the Potomac Company upon the Chesapeake arid Ohio Canal Company; and further providing that, upon the acceptance by the Potomac Company of the provisions incorporating the Chesapeake and Ohio Canal Company, the charter of the Potomac Company should be vacated and annulled. The Potomac Company accepted the provisions of said act, and by deed conveyed in due form of law to the Chesapeake and Ohio Canal Company, all the property, rights, credits and privileges owned, possessed and .enjoyed by the said Potomac Company, and the Chesapeake and Ohio Canal Company accepted the said conveyance, and took possession of the property, rights and franchises thereby surrendered. The charter of the Chesapeake and Ohio Canal Company also provided, that in consideration of this conveyance, said company should become liable for, and pay the debts of the Potomac Company. From this it will be seen, that the corporate franchises of the Potomac Company were continued in the Chesapeake and Ohio Canal Company, and that the said franchises did not, for a single instant of time, cease to exist. The whole case was a matter of contract between two existing corporations, under the sanction of the legislature. Previously to the surrender of its charter by the Potomac Company, Mumma had obtained a judgment against it, but, before the collection of the money, the franchises and property of the company were legally conveyed to the Chesapeake and Ohio Canal Company. Under this state of case, Mumma issued a scire facias to revive his judgment against the Potomac Company, upon the ground that the surrender of the franchises and property of .the Potomac Company, violated its obligation of contract, and derived no legal effect from the legislative acts which authorized the same. In other words, that the law authorizing said surrender was unconstitutional. This was the only point before the court, and the decision was that said *539 law was constitutional — that the Chesapeake and Ohio Canal Company were liable to pay the debts of the Potomac Company ; that, under said law, the property transferred by the Potomac Company to the Chesapeake and Ohio Canal Company, by virtue of the mutual agreements between said companies, became a trust fund for the payment of the creditors of the Potomac Company, and that said creditors could enforce their claims against any of said property which had not passed into the hands of bona fide purchasers. The scire facias of Mumma was disallowed, and he, thereby, compelled to resort to the Chesapeake and Ohio Canal Company for redress. This case, therefore, only decides that where a corporation is continued in new corporators, such continuance carries with it all the obligations of the old corporators. The case does not conflict with the authorities heretofore cited by me, nor with any legal principle which applies to the case at bar.
That the doctrine heretofore laid down is recognized throughout the United States, is further evident from the legislation of the different states, in avoidance of the common law consequences of the dissolution of a corporation.. In New York and Connecticut, it is provided that upon proof of cause of forfeiture in a corporation, the chancery court shall issue an injunction against such corporation, restraining it from the exercise of its franchises, and shall appoint a receiver to collect the property, moneys and effects of the corporation, and to distribute the same among its creditors, but the state does not seize the franchises. Bank of Columbia v. The Attorney-General, 3 Wend. 590; Laws of Connecticut, 1837. In Massachusetts, Vermont, Indiana, Michigan and Wisconsin, on proof of cause of forfeiture, the corporation is continued for the term of three years for the purpose of settling the affairs of the corporation. Folger v. Chase, 18 Pick. 66; Rev. Stat. Vt. 383, §17; Rev. Stat. Ind. 1843, 587, § 19; Rev. Stat. Mich. 229, § 7; Laws of Wisconsin, 1838, 146, § 3. In Ohio, commissioners are appointed with power to sue for and collect any claims, or recover any property of the corporation dissolved, for the use.of its creditors in the same way and to the same extent said corporation *540 could sue and recover, and the powers of the corporation are continued in the commissioners to the extent necessary for the faithful discharge of those duties. Miami Exporting Co. v. Gano et als. 13 Ohio R. 270. In Maryland, the state entirely waives its right of forfeiture, and provides that on proof of any cause of forfeiture, and after a full investigation of the concerns and situation of a bank, the court may, if in their judgment and opinion the public interest shall require it, adjudge the charter of the bank to be forfeited, but the franchises are not directed to be seized. Three commissioners are appointed to settle and close the concerns of the bank, and the officers of the bank are directed to deliver up all the property of the bank to said commissioners, who are authorized to recover any debt due to the bank, in a suit to be instituted in the corporate name or style of the bank. Laws of Maryland, (Dorsey,) vol. 1. 695, 696, § 5, 6, 10. This amounts to a mere ouster of the corporators, and continues the corporation in the commissioners. Not having the statutes of the other states within my reach, the investigation on this subject must end here. But enough has been seen to show, that in all the states previously named, the legislatures have provided, that on proof of cause of forfeiture of a corporation, the franchises are not totally seized, but that either the corporations themselves are continued bodies corporate for certain purposes, or the franchises and property are continued in other persons.
A comparison between the statutes above quoted and the one now before the court, is satisfactory to my mind that the latter does not in terms continue the corporation, and I have sought in vain through every section of the act for the development of any such intention on the part of the legislature. It may be said that the provision that, on the judgment of -forfeiture, the debtors of the bank shall not be released from their liabilities to the same, necessarily implies a continuance of the corporation, inasmuch as the debts could not survive without such continuance. An examination of the whole act, however, shows that the legislature have authorized, on proof of common law causes of forfeiture, a common law judgment of forfeiture, the conse *541 quences of which are a total extinguishment of all debts due to and from the bank, and the reversion of its real estate to the grantor and his heirs. On such judgment, the ownership of the real estate is a vested right in the grantor and his heirs, and the extinguishment of the debts due to the bank is a vested right in favor of the debtors. 2 Kent's Com. 309; 1 Blackford’s Ind. R. 267. After suffering a judgment of forfeiture and seizure of the franchises of the bank, as is the case of the Bank of Port Gibson, the legislature had no right to seize upon any portion of the assets of the bank, except the personal estate, which, by law, vested in the state upon such a judgment. The direction of the legislature that the trustees shall take possession of the rights and credits, and sell the real estate of the bank, is unconstitutional, because it interferes with vested rights. It is an attempt to make a new contract, or rather, to create a debt and make it binding upon the debtor without his consent or knowledge. Such a power does not pertain to the legislatures of this country. Its exercise is against common right and reason, and in violation of those great primary fundamental principles of liberty and natural justice, upon which all legislative action is predicated in a republican government. 2 Harrington Del. R. 18. The collection of a debt, after the same has become extinguished, is an impossibility, and the law directing such a thing, upon long established principles, is a nullity. That the legislature intended that the debt due the bank should be collected, I do not doubt, but unfortunately they have destroyed the only means by which such collection could be made, and to hold that the statute, in attempting to continue the debts under the circumstances here presented, necessarily perpetuates the corporation, would be a view of the law to which I cannot subscribe. In this view of the case, I am sustained by the opinion of Judge Story, in the case of Mumma v. The Potomac Company, heretofore cited. He lays down the principle in the following language : “ A corporation, by the very terms and nature of its political existence, is subject to dissolution, by a surrender of its corporate franchises, and by a forfeiture of them for wilful misuser and nonuser. Every creditor must be presumed to under *542 stand the nature and incidents of such a body politic, and to contract with reference to them. And it would be a doctrine new in the law, that the existence of a private contract of the corporation should force upon it a perpetuity of existence, contrary to public policy, and the nature and objects of its charter.”
In the case of The State v. The State Bank of Indiana, 1 Blackf. Ind. R. 267, a similar authority is found. In the year 1821, it was suggested to the legislature of that state, that said banking company had violated their charter, whereupon an act was passed directing the governor to appoint an agent to cause suit to be instituted against the bank in the name of the state, for the purpose of determining whether they had violated their charter. The legislature further provided that on judgment of forfeiture and seizure of the franchises of the bank, the goods and chattels, rights, credits, and effects, lands, tenements, &c. of the corporation, should be seized upon by the executive on the judgment of forfeiture, and the same to be delivered to the commissioners appointed by the other provisions of the act. Under this act, an informatiofi was filed against this bank, and, on trial of the causes of forfeiture set up in the pleadings, the bank was convicted and judgment was rendered “that the privileges, liberties and franchises of said president, directors and company of said bank be seized into the hands and custody of the state, together with all and singular their goods and chattels, rights, credits and effects, and all and singular their lands, tenements and hereditaments of-what kind, nature and description soever, with costs.” On appeal from this judgment, the supreme court of Indiana, after deciding that that portion of the judgment which directs a seizure of the franchises of the bank was lawful, make use of the following language : “ But when we proceed to that part of the judgment, that authorizes a seizure into the hands of the state of all the goods and chattels, rights and credits and effects, together with all and singular the lands, tenements and hereditaments of the corporation, we are compelled to pause and minutely examine the ground on which this part of the judgment has been founded. "We are aware *543 that several sections of the act of assembly, directing these proceedings against this corporation, are predicated upon the idea that if the corporation had so misused and abused its franchises as to render them liable to seizure, a seizure of the goods and chattels, rights, credits and effects, lands, tenements, &e. of the corporation, would necessarily form a part of the judgment; for the third section of the act directs them to be seized by the execution on the judgment. But we cannot suppose that the legislature intended to alter the law on this subject, for their provisions extend only to this particular case; and even if those provisions were of a general nature, we should have to give them a retrospective operation to bring this case within them, inasmuch as all the causes of forfeiture to which this corporation was liable, were incurred before the passage of the act. In fact, the act does not seem intended to increase the liabilities of the corporation, or in any way to extend the forfeiture to which they were subject.” The court then proceed to examine the common law consequences of the dissolution of a corporation, and lay down the law as set forth upon that point in a previous part of the opinion, and conclude by saying, “ nor does the act of assembly authorizing the collection of the corporation debts by commissioners, to be appointed for that purpose, make any alteration in the case. . . . Theré is nothing in the act calculated to give those debts a continued existence, after the dissolution of the corporation. The act only presumes that they would, by law, have such an existence. The debts must, therefore, be considered, on common law principles, unaffected by the act, and therefore subject to an extinguishment by a dissolution of the corporation.”
The principles established by this case are, to my mind, decisive of the one at bar. The legislature of Mississippi, like that of Indiana, appear to have acted upon the assumption that upon a dissolution of a corporation the state had a right to seize all its assets, and to dispose of them by legislative enactment. They have, not provided that, on judgment of forfeiture, the debts owed by the bank should not be extinguished; nor have they provided that the real estate should not revert to the origi *544 nal grantor and his heirs. They suffer the debts owed by the bank to be extinguished, and the real estate to revert to the grantor and his heirs, and, at the same time, direct that the real property shall be seized by the trustees, and sold. These trustees are not made amenable to the court appointing the same, nor to any other court, but are clothed with the mere duty of collecting the assets which were of the dissolved corporation, and to hold the same, subject to the future order of the legislature; they have no authority to make distribution of the funds collected by them; they cannot be sued by'creditors. A refusal on the part of the trustees to make distribution to creditors would not be a breach of their bond, because the condition of their bond is “to diligently and faithfully collect the debts due such bank, &c. ; to sell and dispose of the property belonging to same, and the proceeds, when collected, to pay over, as may hereafter be directed by law.” The trustees are therefore state officers, with a tenure of office unlimited as to duration, amenable and accountable only to the legislature. And if the legislature fail to direct distribution to the creditors, the latter have no remedy.
It may be said, that the statute shows an intention, upon the part of the legislature, to make distribution to the creditors at some future day. In answer to this it may be replied, that there are now no creditors of the bank of Port Gibson in existence. By the judgment rendered against this bank of Port Gibson, all the claims of its creditors were totally extinguished. The legislature not having declared that this common law consequence should not follow the judgment of forfeiture, the common law in this particular remains in full force. This point was expressly decided in the case of Fox v. Horah. After giving the reasons why goods and chattels of a corporation revert to the state, Judge Gaston says, “ Choses in action are under the operation of a different rule. They are rights of the corporation to demand money in the hands of persons by whom it was withheld. They derive their existence from contracts, or quasi contracts, by which the relation of debtor and creditor was created. Where the creditor corporation died, and there *545 was no successor, no representative, the relation of debtor and creditor ceased, and the debt became necessarily extinct. None but the creditor had a right to demand the money, and when his right ig gone, the money becomes, to all purposes, the money of the possessor.” The claims of the creditors against the Bank of Port Gibson are choses in action, and, under the above rule, were extinguished by the judgment of forfeiture. Again, it will be recollected that the trustees, appointed under the act of 1843, are not trustees for the creditors, but the mere officers or agents of the state, who has assumed to herself to become trustee, under the pretence that at some future day, when it may suit her will and pleasure, she will pass a law to make distribution to the creditors of the late bank of Port Gibson. The state, being a sovereign power, cannot be compelled to make distribution of any assets that may come to her possession. In the case of Fox v. Horah, the latter set up, as the state does here, that he was a trustee for the benefit of the creditors of the bank of North Carolina. In considering this point, Judge Gaston says, “ This brings us to the direct consideration of the great question in the case; Is it against conscience in the defendant (Horah) to collect the judgment? In presenting this inquiry, we may dismiss from our consideration the purposes to which the defendant professes an intention to apply the mo ney when collected. It is not to be questioned, we think, that on the expiration of the charter, the debts of every kind due from the bank were extinguished as completely as the debts due to it. The stockholders, as such, were not responsible for those debts, and the expiration of the charter did not throw upon them any such responsibility. There are, therefore, no outstanding demands against the late corporation, or those who were stockholders therein, which in law or equity can claim to be satisfied out of the money which the defendant seeks to collect, If he collects it, he cannot be compelled to account'therefor to any one, and may therefore keep it to his own use. We can pay no respect to a pretended trust, the performance or non-performance of which is dependent upon the will of the supposed trustee. If the defendant can rightfully collect this *546 money, it is because he has a right to collect it for his own benefit. After much consideration, we are of opinion that he has not a right to collect it for his own benefit.” The performance of the trust, either by the trustees, so styled, or the state of Mississippi, depends entirely upon the future will and pleasure of the legislature. There is no judicial power in this government which can enforce the trust. If, then, the debts are collected, they are collected for the use and benefit of the state.
Messrs. II. T, Ellett and George L. Potter, counsel for Nevitt,
filed-the following petition for a re-argument:
The bill was filed to enjoin execution on a judgment rendered on a promissory note in favor of the hank against Nevitt, and forthcoming bond forfeited on execution thereon.
*546 Another serious question arises in this branch of the case. The distribution of assets among creditors is a judicial act. The claims of creditors can only be settled by an exercise of judicial power, and final distribution to them can only be made by the judgment or decree of a court of competent jurisdiction. If, therefore, the legislature should, at any future day, direct by law the distribution of the assets of the late Bank of Port Gibson to the individual creditors thereof, and allot the portion due to each, it would be a usurpation of judicial power, and, as such, a plain and manifest violation of the constitution. This-extraordinary assumption of power on the part of the legislature can only be accounted for upon the supposition that they regarded all the assets of the dissolved corporation as reverting to the state by operation of law, and that therefore they had a right to dispose of them as of any other fund belonging to the state.
According to the foregoing view which I have taken of this case, the trustees, appointed by the circuit court to take possession of the assets of the late Bank of Port Gibson, can take nothing except the goods and chattels owned by the bank at the time of its dissolution. The state has a vested right in the personal estate of the late Bank of Port Gibson, and, if she chooses, she can by law donate the same to the late creditors of this bank.
On the former argument it was urged that, because the bank was extinct, the judgment had become ineffectual, so that no execution could ever be issued thereon, and so the subject-matter of the litigation presented by said bill was determined and gone; that, as no person could now have execution on said judgment, Nevitt could not be compelled here further to litigate, whether or not the bank, during its existence, was entitled to execution thereon. It was especially insisted that, for want of privity, said trustees could not in any manner have execution on said judgment. Many authorities were cited to sustain this position, but the point was not decided by the court. As this is a point directly involved in the motion, it is important to all parties that it should be adjudged; if decided for Nevitt the motion must be overruled.
2. It was further urged that said judgment debt, and the note whereon the same was obtained, was and became, by the extinction of the bank, wholly extinct and gone; that said contract was so extinct, under and by force of a condition in law thereto annexed, that the same could not be revived or enforced, without impairing the obligation of the contract; that said condition in law was this, that in the event of the dissolution of said bank, the contract should cease and determine.
The court decided against this point, mainly, it would seem, on the authority of a decision in 3 How. Sup. C. R. 534. It is respectfully submitted that, as that case' was decided on the rule of a penalty, and no contract, it affords no answer in the premises. It is admitted that the state may waive a forfeiture, and may continue the existence of the corporation, so that the condition which will defeat the contract, may never attach; but, if the corporation be dissolved, the contract ceases with it. In this case the state has destroyed the corporation; it has done nothing “to release or remit” a dissolution of the corporate body.
The following extracts from decisions will best explain how it was that this bank and this contract became extinct together:
“ Those laws which in any manner affect the contract, whether in its construction; the mode of discharging it, or which control the obligation which the contract imposes, are essentially incorporated with the contract itself.” Campanque v. Burrell, 1 Wash. C. C. R. 341, cited with approbation by Thompson, J. 12 Wheat. 297.'
Per Story, J.: “ The recognizance of special bail being part of the proceedings on a suit, and subject to the regulations of the court, the nature, extent and limitations of the responsibility created thereby, are to be decided, not by a mere examination of the terms of the instrument, but by a reference to the known rules of the court and the principles of law applicable thereto. Whatever in the sense of those rules and principles will constitute a discharge of the liability of special bail, must be deemed included in the purview of the instrument as if it were expressly stated.” Beers v. Houghton, 9 Pet. 356.
With this understanding of the law of contracts, the same learned jurist declared, “ Every creditor must be presumed to understand the nature and incidents (dissolution, &c.) of such a body politic, (a corporation) and to contract with reference to them.” Mumma v. Potomac Co. 8 Pet. 287. Again he declared, “ The bond of the cashier must be construed to cover all defaults in duty, which are annexed to the office from time to time, by those who are authorized to control the affairs of the bank; and sureties are presumed to enter into the contract, with reference to the rights and authorities of the president and directors, under the charter and by-laws.” Minor v. Mechanics Bank, 1 Pet. 73.
So by Chancellor Kent: “ It is an implied condition of every contract, that the party shall be absolved from its performance, if the event takes place which the existing law declares shall dispense with the performance.” 1 Comm. 421.
So, Baldwin, J., speaking of a custom, declares : “ A general custom is a general law, and forms the law of a contract on the subject-matter; it enters into and controls its stipulations, as an act of parliament or state legislature.” United States v. Arredondo, 6 Pet. 715.
Again, “ It may be assumed as a rule affecting all personal contracts, that they are subject to all the consequences attached to contracts of a similar nature by the laws of the country where they are made. The contract being made under the law, is presumed to be made with reference to it. A law providing for the discharge of a debtor when the contract was formed, the contract must be held subject to that law, because it was made with an implied reference to it.” Blanchard v. Russell, 13 Mass. R. 5, 16, 17.
“ The parties are as much bound by provisions contained in a law, as if the provisions had been inserted in and formed a part of the contract.” Smith v. Parsons, 1 Ohio, 113.
Where it (the law) affixes a penalty to the non-performance of a contract, and a party enter into such contract, he contracts in reference to the penalty, and it is as much his penalty as if he had inserted it in his written agreement.” Talvande v. Cripps, 3 M’Cord, 157.
The same principles were declared by three out of six judges in Ogden v. Saunders, 12 Wheaton. Per Washington, J?: “ The law, which accompanies the contract as forming part of it, is regarded and enforced everywhere, whether it effect the validity, construction, or discharge of the contract.” page 259. Per Thompson, J. : “ Parties must be understood as making contracts with reference to existing laws, and impliedly assenting that such contracts are to be construed, governed and controlled by such laws.”' p. 297. He adopts the language of Washington, J. before quoted from. 1 Wash. C. C. R. 341. Per Trimble, J.: “In the case at bar, the contract was made in the state, and the law of the state at the time it was made, in effect provided that the obligation of the contract should not be absolute, but qualified by the condition that the party should be discharged upon his becoming insolvent, and complying with the requisitions of the insolvent law. This qualification attached to the contract by law, the moment the contract was made, and travelled with it through all its stages of existence until the condition was consummated by the final certificate of discharge.” “ It is in the nature of a condition subsequent, annexed by operation of law to the contract at the moment of its creation.” p. 324.
It is true that judges Marshall, Story and Duvall dissented from these conclusions ; but in how far Judge Story afterward concurred, may be read in the above extracts from his opinions.
The following extract shows that Chief Justice Marshall has to some extent yielded his opinion :
“ The -allowance of three days of grace, is a usage which pervades the whole commercial world. It is now universally understood to enter into every bill, or note, of a mercantile character, and to form so completely a part of the contract, that the bill does not become due, in fact, or in law, on the day mentioned on its face, but on the last day of grace.” Per Marshall. Bank of Washington v. Triplett, 1 Pet. 31; see also Van Ness v. Pacard, 2 Pet. 148.
In this view the supreme court declared the statute laws of Illinois were “as mucha part of the contract as if they had been set forth in its stipulations in the very words of the law.” McCracken v. Hayward, 2 How. 613. For this'reason that court declared this rule: “ Mortgages made since the passage of these laws must' undoubtedly be governed by them ; for every state has the power to prescribe the legal and equitable obligations of a contract to be made and executed within its jurisdiction. It may exempt any property it thinks proper from sale, for the payment of a debt, and may impose such conditions and restrictions upon the creditor as its judgment and policy may dictate. And all future contracts would be subject to such provisions; and they would be obligatory upon the parties in the courts of the United States, as well as in those of the state.” Bronson v. Kinzie, 1 How. 321. So fully is this doctrine recognized that the supreme court of New York, by Spencer, J., declare that it is “ universally recognized in courts of justice,” and they declared upon the New York insolvent act of 1813.
“ It is the same, then, in effect as if the insolvent act of April, 1813, had been expressly inserted in the contract, on which the judgment in this case was rendered, and the substance of the contract between the parties is, that the contract shall be literally fulfilled, unless the defendant becomes an insolvent debtor, within the meaning of the act of 1813, and is duly discharged from his debts.” Mather v. Bush, 16 Johns. 249, 250.
In this view, Thompson, J. declared : “ When the operation of a contract is clearly settled by general principles of law, it is taken to be the true sense of the contracting parties.” Thompson v. Vetcham, 8 Johns. 192; and Brougham, delivering his opinion in the house of lords, expressed the same idea: “ The laws of each nation lay down the forms and solemnities, a compliance with which shall be deemed the only criterion of the intention to enter into the contract.” Cited Story Confl. Laws, sec. 226, c. note 2. Judge story presents the same point in his doubt if a note not assignable when made, can become transferable by any subsequent law, “since (says he) it (the transfer) seems to concern the interpretation and obligation of the contract.” Conflict Laws, sec. 357.
In the same sense he declares, “ Payment or extinction, according to the laws of the place of the contract, is payment or extinction of the debt everywhere.” 2 Mason R. 166. And further, “ The obligation of a contract is the duty to perform it whatever may be its nature, that is, the right to performance which the law confers on one party, and the corresponding duty of performance to which it binds the other; the law may limit the extent and force of that obligation in personam, or in rem. It may bind the party personally, but not bind his estate; or it may bind his estate and not bind his person; or it may be revocable or dissoluble, in certain future events, or under peculiar circumstances.” Confl. Laws, sec. 266. The doctrine of these extracts is no “ Mississippi novelty ; ” it was declared as early as 1797. In Melan v. Fitz James, 1 B. & P. 142, Rooke, J. declared, “If the law of France has said that the person shall not be liable on such contract, it is the same as if the law of France had been expressly inserted in the contract.” In Talleyrand v. Boulanger, 3 Ves. jr. 449, Lord Rosslyn adopted the same principle.
The same rule was expressed and applied in the case of a bank charter in McLaren v. Pennington, 1 Paige, 108, 109. So in an action on a note made and indorsed in Illinois, the supreme court of Massachusetts declared the same rule.
“By the law of Illinois, the indorser is liable only after a judgment against the maker; and as no such judgment appears to have been obtained on this note, the condition upon which alone the plaintiff may sue is not complied with, and therefore the action cannot be maintained. The law in question does not effect the remedy, but goes to create, limit, and modify the contract effected by the fact of indorsement. In that which gives force and effect to the contract, and imposes restrictions and modifications upon it, the law of the place must prevail,” &c. Williams v. Wade, 1 Metcalf, 83.
These authorities are sufficient to show in what sense we insist that the law in force at the date of the contract, so enters into and controls the contract, that the happening of any contingency which would, under the law existing when the contract was made, discharge it, will in all time subsequent operate and determine the contract. We repeat the language of Kent, as an apt summary of these cases : “It is an implied condition of every contract that the party shall be absolved from its performance, if the event takes place which the existing law declares shall dispense with the performance.” 1 Comm. 421. It matters not whether it be said that the law enters into and forms a part of the contract, or that parties so contract with reference tb the existing laws and to the consequences, in relation to the discharge of the obligation which those laws declare shall attach in a given contingency, all we ask is that you look to the laws in force at the date of the contract as creating the obligation and prescribing how it may be discharged or become null, as the true criterion of the intent of the parties. Beyond all question the law at the date of this contract was, that in the event of the dissolution of the corporation, the contract should become and be extinct. We say that a tacit condition in law annexed to the contract was, that in the event of such dissolution occurring whilst the bank held this contract, Nevitt should be “ absolved ” from performance. The same rule is laid down by Coke in relation to grants of realty to a corporation; (Co. Lit. 13, b.) ; and it is worthy of remark that at the time when Coke wrote, a corporation might defeat the condition of reverter by a conveyance of the lands; this was not inconsistent with the condition, for the power so to convey was also incident to the grant.
So, by the very terms of the contract, a bonk- may transfer a negotiable note, and prevent the operation of the condition to which we refer; this results also from the express or implied promise of the contracting parties. If the law in force at the time recognized the equitable rights of a transferee of paper not negotiable, a transfer of such anote would come within our rule, and the promisor would be held to have contracted with ieference to the right of the bank to transfer such an equity. The case of Lenox v. Roberts, 3 Wheat. 376, decides nothing more.
The case of Maryland v. Baltimore and Ohio Railroad Co., 3 How. 534, is not an authority against our position. We assert that, under and by force of a condition in law annexed to his contract in its creation, Nevitt is released from his obligation ; it is no answer to say the state may waive or remit a penalty, orto say the state has in part changed the consequences of a judicial forfeiture. The condition of discharge relates to a dissolution of the corporation, whether it be by a judgment or by limitation ; and the' state has dissolved the corporation; it matters not whether or not the state has waived or changed any effect or consequence of a dissolution, for the state cannot both dissolve the corporation and annul a condition of this contract. A review of the extracts before quoted will show that the rule on which we rely does not relate to future legislation as affecting the contract, much less does it relate to the power of legislation. If it be insisted that contracts are to be interpreted with reference to all the tacit conditions annexed to the contract by the existing law in reference to which the parties contracted, will the court declare that the contracting patties had reference also to the legislative power and to future legislation ? Will these, as does the existing law, declare the intent of the parties, at the date of the contract? This condition on which the contract may cease, is of the obligation of the contract, and in no sense relates to the remedy to enforce it.
It is further submitted, that the decisions in Bank of Maryland v. Ruff, 7 Gill & Johns. 465; Bank of Columbia v. Attorney-General, 3 Wend. 600; 13 Ohio R. 270, are not authorities against our position.
In Bank of Maryland v. Ruff, the decision was upon an assignment made by the bank to trustees, and the question was upon the right of the trustees to receive the issues of the bank in payment of its debts. This point was decided in the affirmative upon the statute of Maryland, and this, it is conceived, is the point there said to have been decided by the supreme court of the United States.
The cases in 3 Wendell and 13 Ohio, both refer to the bank insolvent laws of New York and Ohio; by which laws a receiver is appointed over the insolvent bank, but the corporation is not dissolved. This point has been expressly adjudged. Bank of Niagara v. Johnson, 8 Wend. 645.
In 3 Wendell, the court expressly waived the constitutional question, whether the state had the power to provide for the appointment of such receiver. In 13 Ohio, it was suggested that the corporation had been subjected to the law,- and the court merely referred to the clauses of the statute which provided, that in such case, the receivers or trustees should sue. The validity of the act was not in question, nor was it decided. The same may be said of the North Carolina act; it was merely referred to in Fox v. Horah, with the remark that it did not reach the case under consideration. The North Carolina act differed from ours in this; it provided that the debts to and from the corporation should not be “ extinguished ” — we are not aware if the validity of the act has been tested.
In New York, Missouri and New Jersey, it is provided, that on the dissolution of a corporation, its president and directors shall be trustees to close its concerns; thus continuing the corporation in these officers. In Rhode Island and Georgia, the corporate existence is continued after judgment of forfeiture, for the purposes of suits and settlements.
In Maine, Wisconsin, Michigan, Vermont and Massachusetts, banking corporations are continued for three years after their charters are annulled, or gone by judgment of forfeiture, or by limitation, for purposes of suits and settlements.
In Pennsylvania, banks, after they are proclaimed forfeited, are continued for suit and settlement. The necessity of these provisions, to prevent an extinction of the debts, is declared in Folger v. Chase, 18 Pick. 66.
In Connecticut, Maine, New York, New Jersey, Ohio, Tennessee, Massachusetts, Michigan and Vermont, there are insolvent bank laws, under which commissioners, &c. wind up the affairs of the bank, but the corporations are not destroyed.
In Indiana, by the act of 1824, the credits and estates of corporations vested in the state, in her declared conjoint capacity of heir and administrator. In the revised acts, 1845, on judgment of forfeiture, the state attorney is required to apply for an injunction and receiver against the corporation, which shows the corporation is not defunct.
In Pennsylvania, New York, Massachusetts and Maine, a general law reserves the legislative power to repeal and alter charters.
See Revised Laws of Maine, p. 329, 759 ; of Connecticut, p. 94; Wisconsin Laws of 1839 ; Ohio Rev. 1841, p. 142, acts 1839, 1842; Indiana Rev. 1838, p. 409 ; Michigan Rev. 1S38, p. 229; Massachusetts Rev. 1836, p. 363; North Carolina, acts 1831, 1 Rev. Laws, 1837; Vermont Rev. 1839, p. 383; Missouri Rev. 1845 ; Tennessee act, 1836; Rhode Island Rev. 1822, p. 435 ; Pennsylvania acts, 1823, 1824, p. 69; 1818, 1819, act May 21, 1814; Georgia, 1842, p. 29; New Jersey act, 1829 ; 1 New York Rev. Code, 601, acts 1825.
So far as rules are to be derived from the examples of the other states, it is conceived there is nothing to sustain the ground assumed for this motion, to be found in the enactments referred to. So far as counsel have examined, there is found but one decision which can be said to decide upon the matter in controversy.
In Lincoln, &c. Bank v. Richardson, 1 Greenl. 79, it was held that a dissolved corporation might be so revived as to enable it to sue a stockholder for a debt due before its dissolution. The case was submitted without argument, and decided in the like manner; it was supposed to be analogous to the case in Foster v. Essex Bank, 16 Mass. R., but there is no similarity in the cases. A main reason for the decision was the supposed assent of the defendant.
It is further submitted, that 'the rights of Nevitt cánnot be made to depend upon the former action of the court, on another section of the quo warranto act. He stands upon his contract, and not upon the validity or invalidity of the injunction clause of the statute.
3. It was before urged, that the clause of the act providing that debtors should not be released by the judgment of forfeiture, was enacted in misapprehension of law, and was wholly inoperative; that this act and the law of Indiana were both enacted under a like mistake, and, as both appointed persons to collect, a decision on the Indiana act was directly upon the questions of extinction, &c., and fully in point.
4. That the trustees had no legal title to this judgment. The fact that they are required to do other things which can only be done by a transfer to them of the legal property, is not conclusive to show their legal right to this judgment. If it were, then it must be held that what were mere equities in favor of the bank, pass to the trustees as full legal rights. It is conceived that the enactments relative to estates of decedents, are not analogous to the provisions in relation to these trustees. “ Executors, &c. shall have full power and authority to commence and prosecute any personal action whatever, at law or in equity, (as the case may require,) which the testator or intestate might have commenced or prosecuted,” &c. H. & H. 412, sec. 88. If it be said that, because the legislature may provide for the collection of the debts due a decedent, it may also provide for the colle'ction of debts due a defunct corporation ; the answer is, that neither in the one case nor the other could the state so provide, if the debtor contracted with reference to the common law rule, that on the death of a person, natural or corporate, all debts due to that person were extinguished. Under existing laws for the collection of debts due a decedent, contracts are not made to a natural person with reference to this rule of common law. Had such statute laws never existed in Mississippi, the rule for which we contend would apply as well to the case of a deceased creditor, as in that of a defunct corporation. The late bankrupt act vests rights of action in the assignee, and directs that “ all suits in law or equity, then pending, in which such bankrupt is a party, may be prosecuted and defended by such assignee to their final conclusion, in the same way, &c. as they might have been by such bankrupt.” Sec. 3.
5. If' the trusts are so declared by the statute, that a court of equity may enforce them pro raía according to the rules of equity, so that the legislature cannot alter the disposition of the trust; can the legislature, under the rule declared by the court on this point, even now declare the order of payment out of the trust property ? Has not the judgment of the court placed this subject beyond the legislature 1
Mr. Justice Clayton
delivered the opinion of the court on the application for a re-argument.
The importance of the interests involved in this cause, and other circumstances attending it, induce us to depart from our usual course upon such petitions, and to state somewhat in detail, the reasons which influence our determination.
The petition contains a very elaborate reference to authorities to prove that the existing laws enter into and form part of every contract. In our view, this was wholly beside the matter involved, because in the former opinion it was fully acknowledged, that all legislation which materially affects the laws for the enforcement of a contract, in existence when such contract was made, do impair its obligation. But it was also stated, that the contract of charter between the bank and the state, is one with which the debtors have no concern. By a breach of the conditions implied in every charter, the corporation forfeits its franchises. This forfeiture the legislature has a right to remit in whole or in part.
The petition urges “ that the consequences of the forfeiture of charter, enter into and form a part of the contract between *558 the bank and its debtor; and that if the state enforce a forfeiture of the charter, and do not remit the dissolution of the corporate body, the contract ceases with the corporate existence. In other words, not only must the consequences of the forfeiture be remitted, but the existence of the corporation itself must be continued, in order to preserve the contract from extinguishment. The state cannot suffer the corporation to be dissolved, and save the debts due to it from extinction.”
We do not think this position has been sustained, either upon authority or reasoning; and we think the contrary can be made manifest by both. We shall for the present lay aside the former opinion in this-case, and the authorities there cited, and shall turn to other decisions.
The case of Mumma v. Potomac Company, 8 Pet. 281, is in my apprehension of it, a direct authority to the contrary. In that case Mumma was a judgment creditor of the Potomac Company at the time of its dissolution. It had surrendered its charter to the Chesapeake and Ohio Canal Company, under the sanction of legislative acts of both Maryland and Virginia, passed upon its own application, and with its own consent. After all this, Mumma issued a scire facias to revive his judgment against the Potomac Company. The right to revive was placed upon the ground, that the deed of surrender violated the obligation of the contracts of the company, and that the legislative acts of Maryland and Virginia were on that account void, and without legal effect. On this point the court say : “We are of opinion that the. dissolution of the corporation, under the acts of Virginia and Maryland, cannot, in any just sense, be considered within the clause of the constitution of the United States on this subject, an impairing of the obligation of the contracts of the company by those states, any more than the death of a private person can be said to impair the obligation of his contracts. The obligation of those contracts survives; and the creditors may enforce their claims against any property belonging to the corporation, which has not passed into the hands of bona fide purchasers; but is still held in trust for the company, or for the stockholders thereof, at the time of its dis *559 solution, in any vnode permitted by the local laws.” Language more emphatical, or more to the purpose could not be employed : the obligation of those contracts survives. Nor was there any provisions in the charter of the Chesapeake and Ohio Canal Company, that it should pay the debts of the Potomac Company. I have examined not only the statement of the case upon this point, but the original charter of the Chesapeake and Ohio Canal Company, as granted by Yirginia, with minute care as to this fact, and the provision does not exist. There was a provision that the debts of the old company should be received in payment of the stock of the new compány, “and if any creditor did not vest his demand in such stock, it should be the duty of the new company to pay to such creditor annually, such dividend or proportion of the net amount of the revenues of the Potomac Company, on an average of the last five years preceding the organization of the new company, as the demand of such creditor might bear to the aggregate amount of the debts of the Potomac Company.” Yirginia Acts of 1824, p. 41. The new company was not bound to pay a dollar of its own funds to the debts of the old. The court further remark : “ Here is provided an equitable mode of distributing the assets of the company among its creditors, by an apportionment of its revenues, in the only mode in which it could be practically done upon its dissolution; a mode analogous to the distribution of the assets of a deceased insolvent debtor.” The judgment was against Mumma; but in my understanding of the opinion, “ he was not thereby compelled to resort to the Chesapeake and Ohio Canal Company for redress,” except so far as they were trustees. It does not decide, in my view, “ that when a corporation is continued in new corporators, such continuance carries with it all the obligations of the old corporators.” It only holds, in the language of the court itself, “that the creditors may enforce their claims against any property belonging to the corporation, which has not passed into the hands of Iona fide purchasers, but is still held in trust for the company, or for the stockholders thereof at the time of its dissolution, in any mode permitted by the local laws.” This mode must be by a pro *560 ceeding against the new company as trustees or assignees, to subject the trust property. There is not the most remote intimation that Mumma had any right except to pursue the property, which by the surrender and contract of surrender had been converted into an express trust fund for the payment or liquidation of debts. The case is in all respects parallel with this, except that Mumma was a creditor, and Nevitt is a debtor. If this varies the principle, I am unable to perceive it, for the common law rule is, that upon dissolution, “ the debts due to and from a corporation are equally extinguished;” and there is no reason why both may not equally claim exemption from the rule, when the legislature shows an intention to alter it. See Story’s remarks on this case, 2 Com. Eq. 2d ed. 499, § 1252; Smith v. Chesapeake and Ohio Canal Company, 14 Pet. R. 45.
Authority equally strong is to be found in the case of Bleakney v. Farmers and Mechanics Bank of Greencastle, 17 Serg. & Rawle, 65. This was a proceeding against a debtor of the bank. The case expressly decides that if a bank charter be forfeited, and the bank dissolved, and the bank should be after-wards resuscitated, it may collect the debts due to it when the forfeiture took place. The law restoring it “ works no injustice, infringes no man’s right, and impairs no contract,” in the language of the court. It is not necessary for us to go the whole length of this case ; but it certainly accords with Momma’s case in the principle, “ that the obligation of the contract survives the dissolution.” The case of Lindell v. Benton & Kennedy, 6 Mis. R. 364, is to the same effect. It is there decided, that if a garnishment issue by a creditor of a bank, against its debtor, and be served, such debtor is bound to pay, notwithstanding the charter expire before judgment upon the garnishment.” ' See 7 Met. 340. This is upon the principle that the garnishment is in the nature of an attachment, and operates as a legal assignment of the debt to the creditor. I shall have farther use for this principle before the conclusion. The case of McLaren v. Pennington, 1 Paige Ch. Rep. 102, which will hereafter be adverted to more particularly on another point, is a strong authority in favor of the constitutionality of this law.
*561 It is thus seen that upon the highest authority upon constitutional questions known to our frame of government, it is settled that the obligation of the contract of a corporation survives its dissolution ; and that the same principle has been recognized in slate courts of great respectability.
Let us now see how the matter stands upon reasoning. It is settled clearly and conclusively, that no .one can take advantage of a forfeiture of charter, but the sovereign authority which granted it. Such forfeiture or violation cannot be enforced, or set up in defence by any third person, either directly or collaterally, to avoid compliance with a contract. It can only be done by, and in the name of the government. Ang. & Ames, 664, and the numerous cases cited. If, then, this defence be a vested right; if the contract to pay is at an end, when the charter is forfeited, if a law to continue its obligation be a nullity, where is the remedy of the debtor to enforce it? There is none independent of the will of the government. What is a constitutional right worth, which depends upon the mere will and pleasure of the government for its assertion or enforcement? A constitutional right, without a corresponding remedy is a solecism in terms.
This reasoning is equally true, whether the government enact a law continuing the corporate existence after judgment of forfeiture, or continue modified powers of the corporation in the hands of assignees. It is an entire surrender of the constitutional question, to say the corporate existence may be continued for a qualified purpose, after judgment of forfeiture. The argument is, that by the forfeiture judicially declared, the debtors have a constitutional right to be discharged, because that is a part of the contract. If this be true, the legislature has no power to vary the right a hair’s breadth, and every law ever passed on the subject is violative of the constitution, and void. The form of the law can make no difference.
The almost universal prevalence of such enactments in some shape or other in the states of this union, proves that they have their foundation deeply imbedded in an innate sense of justice; and the condemnation of the common law rule by such men as *562 Kent, as Gaston, as Tucker, and many others such as they, shows that it is in utter hostility to the spirit of this age. It belongs to the period when men who could not pay their debts were imprisoned for life, and when the estates of criminals were confiscated to the government; and it should be consigned to the same tomb with these antiquated barbarisms.
If the bank debtors .cannot enforce the forfeiture, nor evade the binding force of their contract, without the action of the state; if the state may legally refuse to interpose at all, it follows it must have power to prescribe the extent of its interference. If the legislature may decline to act, it is not a question of right, but of discretion, — it is not a question as to the power to act, but as to the mode of acting.
Let us now look at the argument in another of its phases. It is this, that under statutes of this kind, the debts are extinguished, “ unless the corporations themselves are continued bodies corporate for certain purposes, the franchises not being totally seized, or unless the franchises and property are continued in other persons.” This doctrine will now be examined.
A charter is not valid until accepted on the part of the corporation. A surrender is not valid without acceptance on the part of the state. A law continuing a body corporate with part only of its franchises in its own hands, or in other hands, would be inoperative until its terms were accepted by the corporation. Whenever a charter or grant operates as a new creation, the .new corporation cannot be subject to the liabilities nor possess the rights of the old. Angel & Ames, 54, 658, 668. The Dartmouth College case settles the doctrine, “that unless a power be reserved for the purpose, the government cannot, without the consent of the corporation, alter or amend the charter, or add to or diminish the number of trustees, or remove any of the members, or compel it to receive a new charter.” 4 Wheat. 518. No new modification of its charter, by which the management of its affairs is taken out of the hands of its officers, and conferred upon others, can be enforced without its consent. This is settled doctrine, if anything in the law is settled. But it may be said, that this is intended to limit the extent of legislative interfer *563 ence, when no judgment of forfeiture has been pronounced. To a certain extent this is true, but after reaching that limit, the principle is the same áfter judgment as before. By the judgment of forfeiture, and execution of that judgment, the corporation may be dissolved. Without any express reservation of power for the purpose, for causes judicially ascertained, the state may resume its grant. But when it has done so, the power to force a modification of the original charter upon the corporation is an entirely different matter. Such power does not exist. When the attempt is made, when after a judgment of forfeiture is pronounced and executed, the bank is told it can no longer exist with its old powers, and its former machinery of president and directors, but it is still to be a corporation in the hands of receivers, or trustees, or assignees to wind up its concerns ; it may well reply, Stop, pause. I did not make this bond —non veni in hcec fcedera. I did not put on these chains; this is not my agreement. You have the power to take away my whole charter under your judgment, -or you can. take away part of my franchises, provided you leave me enough still to go on. But you cannot force another charter upon me, nor any material modification of this. See 4 Gill & Johns. 1.
If the corporation be continued in the hands of the same corporators, enough of power must be left to them to conduct it. It may be dissolved for certain purposes, or to a certain extent only, but it is wholly dissolved when an integral part is lopped off, without which the functions of the corporation cannot be exercised, and when the corporation has no means of supplying that integral part. 2 Kent, 307; Ang. & Ames, 654; Lehigh Bridge Co. v. Lehigh Coal Co. 4 Rawle R. 1; Rex v. Passmore, 3 T. R. 242. The power of perpetual succession, that is, of keeping up its organization, is of the essense of the corporation, one of its inseparable incidents, and indispensable to its existence. 2 Kent, 277; Kyd on Corp. 13; 1 Black. 475; Ang. & Ames, 65. When, therefore, the law, after a judgment, deprives the corporation of this integral part, the power to keep up the succession, it is wholly dissolved, because “an integral part necessary to its vitality is gone, without power in the cor *564 poration to restore it.” This is death, not life — dissolution, not continued existence. 23 Pick. 346.
The case in 8 Peters, already cited, puts the existence of the new corporation upon the voluntary surrender of its franchises by the old, its ratification by the government, and acceptance by the new company. The preamble of the new charter states that it is granted upon that ground. In no other way than by their mutual consent,-and the consent of the respective governments, could it have been effected. The case forcibly concludes by stating, “ that it would be a doctrine new in the law, that the existence of a private contract of the corporation should force upon it a perpetuity of existence contrary to public policy and the nature and objects of its charter.” The case therefore establishes, that upon a surrender of its charter, an acceptance of that surrender by the government, and a surrender of its assets to pay its debts, a continued existence cannot be forced upon it. The consequence is the same on a judgment of forfeiture executed, as on a voluntary surrender. In each instance the state has given its assent to the dissolution, and when dissolved, whether by surrender or by force of law, a farther existence cannot be forced upon the corporation. It must consent. 9 Gill & Johns. 365.
The attempt to continue the corporation in other hands is equally beyond the sphere of legislative action. If the appointed are to be still regarded as in the exercise of the corporate functions, it falls equally under the condemnation of the constitution, unless the corporation consent. That can hardly be a law which depends for its enforcement upon the consent of those upon whom it is to operate. Judgments are rendered in invitos, against the reluctant; they would have little effect if their execution depended upon the consent of those upon whom they bear. Laws, according to a celebrated writer, are made “ to guard against what men may do, not to trust to what they will do.” If, then, by the settled construction of the constitution, the government cannot amend or alter the charter, or remove any of the members, in what just sense can it be said, “ that a judgment of forfeiture may amount to a mere ouster of *565 the corporators, and continue the corporation in the commissioners?” This would indeed be a new contract, without the consent of one of the parties ; u and this new corporation could not be subject to the liabilities, nor possess the rights of the old.”
Let me not be misunderstood. I do not deny the power oí the legislature to provide .by law against the common law consequences of dissolution of charter. Nor do I deny its power to direct the court which pronounces the judgment of forfeiture to appoint trustees, assignees, receivers or commissioners, with power to wind up the affairs. That power, in my estimation, is derived from a well-recognized principle, to which I will presently advert. But I do deny, that any law which does not provide for the continued existence of the corporation, is ineffectual to carry out the purposes of the legislature, if it provide for the appintment of trustees. I do deny that the legislature has any power to force a continued existence upon a corporation, after taking away its material franchises under a judgment, striking down its capacity of succession, and of electing its own officers; And I deny the power of continuing the corporate existence in the hands of others, without the consent of the corporation, unless power to do so be reserved in the charter, or unless there be a general law authorizing it to be done, before the creation of such corf oration.
A very large number of the states of this Union have passed laws on this subject. There is a good deal of diversity in the details of their provisions, but they all have a common object in view — the alteration of the common law principle of extinguishment, and the application of the assets to the payment of the debts. One class of these statutes directs that the suits which may be brought shall be in the names of the trustees, or in the name of the recipients of the assets of the bank, whatever that name may be. The right to sustain suits in that mode, can be firmly placed upon the principle of assignment.
At any time before the dissolution of a corporation, it may make an assignment of all its effects. 2 Kent, 315; 7 Gill & Johns. 448. The assignee is then clothed with all the powers *566 of the assignor. The transfer, under statutes of this description, is an assignment by operation of law. Executors and administrators are assignees in law. 1 Lomax Ex’rs. 287; 1 Williams’s Ex’rs. 510. The interest acquired under an attachment, or garnishment, is upon the principle of assignment. 1 How. 48. Every judgment, execution and sale thereon operate only a legal assignment of the interest of the defendant. So in regard to bankrupt and insolvent laws. Upon a certain state of facts, a decree is rendered, or judgment pronouhced, an assignee is appointed, to whom, by mere operation of law, the whole estate of the debtor is transferred. The assignee thenceforth stands in the place of the debtor, as to the collection and disbursement of the assets. 'Various other illustrations of the principle might be adduced. So when, under this law, the charter is declared forfeited, trustees are appointed, to whom the effects of the bank which is dissolved, pass as by assignment. This is the principle on which the case already cited from 6 Missouri R. stands ; and the principle upon which the legislation on this subject may rest with safety. The practice of judicial assignments seems to be coeval with the common law, and to rest upon a basis not to be shaken.
The statute of Wisconsin provides that when the charter of any bank shall be annulled, the court may appoint receivers or trustees to take charge of the assets, and to prosecute or defend suits in the name of such corporation, or otherwise. Stat. Wis. 147. That is, may sue in their own name, or. that of the corporation.
In Missouri the officers of the bank, at the time of its dissolution, are to be trustees to settle, &c., with power to sue in the names of the trustees of such corporation, describing it by its corporate name. Miss. Rev. St. 236. In Indiana the state is made the trustee, and all demands may be prosecuted in the name of the state, or its assignee. Ind. Rev. St. 149. This act was passed after the decision of The State Bank v. The State, 1 Blackford, and did what the court decided had not previously been done.
In New York there are two modes of proceeding against cor *567 porations; one in the chancery court, by which their powers are suspended, when abused. 2 Rev. St. 462. The other in a court of law, by which, upon the dissolution of a corporation, the directors or managers, existing at the time, are declared to be trustees for the creditors and stockholders, with power to settle the concerns of the corporation. 1 Ibid. 600. See 2 Kent, 304, 307.
In North Carolina the statute provides that the court rendering the judgment that a corporation has forfeited its charter, or has been dissolved by surrender or otherwise, shall appoint a receiver who shall have full power to collect, in his name, all debts due to the corporation. It makes no provision for continued existence. In the case of Fox v. Horah, 1 Ired. Eq. R. Judge Gaston inserts this statute in his opinion, and comments upon it, in terms of marked approbation. Not the slightest intimation escapes from him that it is unconstitutional; it is evident he thought it was not.
The case of Folger v. Chase, 18 Pick, does not decide that the continued existence of the corporation is necessary to prevent the extinction of the debts. It only says, that the statute of Massachusetts, which gives continued existence for three years to a charter which would otherwise expire by express limitation, or in any other mode, “is a just and wise remedial law, and ought to be liberally construed, because it guards against the inequitable consequences of the common law, in regard to the civil death of a corporation.”
In New Jersey a charter was granted by the legislature to the Protection and Lombard Bank, containing a clause that the legislature might alter, amend, or repeal the charter. The charter was repealed, and certain persons constituted trustees, with authority to institute suits in their own names, as trustees of the creditors and stockholders, for all debts, &c. There was also a general statute, providing that on the dissolution of a corporation, the directors then in office should be trustees for the stockholders and creditors, and that all the property and rights of the corporation should be transferred to the trustees. Jt was insisted, notwithstanding these provisions, in a suit *568 brought by the trustees in New York, that the debts due to the corporation were extinguished. The suit was in the name of the trustees. The court sustained the law, saying, “ there never was an instant of time, when the debtors of the bank were released from their obligation.” M’Laren v. Pennington, 1 Paige, 110. This is to the point.
Aside from authority, let us look at this point upon principle, in another aspect. It is the better doctrine, that it is not the mere judgment of ouster or of forfeiture, which works dissolution, any more than sentence of death executes a criminal. There must be execution executed. Willc. 186; Ang. & Ames, 644; 1 Blackf. R. 278; 4 Cowen R. 122, n.; 1 Spear S. C. Rep. 449. The appointment of trustees is intended by the statute to be a part of the judgment, or to be made at the same instant with it. By the judgment, or simultaneously with it, the assets pass to the trustees, in trust for the creditors and stockholders in virtue of the assignment. When the judgment afterwards is carried into effect by a seizure of the franchises, the debts due the bank have already been passed beyond the reach of the consequences of a dissolution, and no extinguishment takes place, even if all contended for in argument be granted. So odious are the common law consequences of forfeiture of charter, that it is said by an eminent judge, “ that no judgment of forfeiture has ever been entered up, and acted on by the courts.” State v. Bank, 1 Spear S. C. Rep. 449. This was the fact in regard to the city of London, and the practice seems to be uniform. Willc. on Cor. 186. Until the execution of the judgment, therefore, there was no extinction of the debts, and they passed by the legal assignment to the trustees, upon the premises assumed in argument.
In Maryland the court which declares the forfeiture is authorized to appoint commissioners, “ who may recover any debt due to the bank in a suit to be instituted in the corporate name.” 1 Dorsey, 695. ,It does not say the debts to or from it shall not be released, nor does it provide for a continued existence. This statute has been repeatedly acted on by their courts. When it is said in regard to this act that it does not direct the franchises *569 to be seized, it may be replied that the statute of this state does not either. And when it is said further, “ that the judgment under it amounts to a mere ouster of the corporators, and continues the corporation in the commissioners,” the reply is, if that be its scope and object, it is wholly unconstitutional according to the settled construction of that instrument, unless the corporators assent to it, for which no provision is made. But we do not think that is a legitimate deduction from the statute, because it expressly speaks of a judgment of forfeiture of charter. The distinction between a judgment of ouster and of forfeiture is, that the former is against individuals who usurp a franchise or intrude into an office, the latter is against the corporation itself. The former is rendered upon a proceeding against the individuals who thus act, the latter upon proceedings against the corporation. The statute directs proceedings only against the corporation, not against individual corporators. The statute itself denominates it a judgment of forfeiture, and I see no reason to change its designation, especially as it does not authorize a judgment of ouster.
The statutes of Massachusetts, Maine, Michigan, Yermont, Wisconsin and others are almost identical in their terms. They provide that corporations, when their charters expire, or shall be annulled by forfeiture or otherwise, shall be continued bodies corporate for three years from such time for closing their concerns. And that the court, upon application of any creditor or stockholder may appoint receivers for that purpose with power to prosecute or defend suits in the corporate name or otherwise, as if such corporation were in being. One or two of them omit the word otherwise, in the last clause.
This statute, or a very similar one, was passed in Massachusetts as early as 1812, and it seems to have been the parent of those in the states just named. The supreme court of that state had it under consideration in Crease v. Babcock, 23 Pick. 346. They say “ that when the charter is repealed ” (or has been annulled) “ it has ceased to have force as a charter. It has expired. This is its dissolution. The corporation derives no power from it. It cannot carry on business. It exists by *570 virtue of the 7th section, and that gives it force only for certain definite, specific and limited purposes. This qualified prolongation of the existence of the corporate body is in the nature of an administration of its estate. All rights under the defunct corporation were fixed at its dissolution. But it has a nominal existence, for the purpose of closing its concerns in the most convenient manner, and especially of compelling it to execute its contracts and discharge its obligations and liabilities.” So entirely was the corporation in that case considered at an end, that a remedy was afforded against the individual stockholders, in pursuance of the statutes. This law contemplates the consequences of dissolution in two aspects. If the officers of the bank will carry out its provisions virtually as its administrators, they are permitted to do so; if they do not, the court, upon application, may appoint receivers for the purpose. These may prosecute or defend suits in the corporate name or otherwise. How otherwise but in their own name 1 This shows very clearly that in the opinion of these legislatures, either mode is legal.
The statute of Massachusetts provides that the court may at any time within three years after the expiration or forfeiture of the charter, upon application, appoint receivers, and may extend their powers beyond three years, if deemed necessary. This shows the legislature knew that the bank, might refuse to accept this prolonged existence, and might refuse to carry out the provisions of the law; to guard against that contingency, power is given to the courts to appoint others, who would carry the law into effect. Mass. Rev. Laws, 364.
The case of Foster v. Essex Bank, 16 Mass. R. decides this law to be constitutional in all its parts, as well the compulsory as the voluntary clause. The case of Crease v. Babcock, above cited, proves that the bank is, in the eye of the law, dissolved when the charter expires, or is judicially determined to be forfeited. That the continuance of the corporate powers is the mere administration of its assets, and that the administrators act not as a- corporation, but as the assignees of its effects. A court may be entrusted with power to grant longer time to administrators to settle their accounts and wind up an estate; but *571 it would not be thought that it could constitutionally exercise authority to create or continue a grant of corporate powers. That belongs to the legislature alone.
These cases hold the law as it stands to be constitutional. The bank may continue to act under the statute to wind up its affairs, but if its officers will not do so, then receivers may be appointed who will. They show that either mode is lawful, not that one is, and the other is not.
A change of charter is a mere proposition to change, until accepted. Maryland v. Baltimore and Ohio Railroad Co. 12 Gill & Johns. 399.
The Ohio statute directs that after judgment of forfeiture, the charter of said bank shall be a dead letter to all intents and purposes upon dissolution, as if the same had never been granted ; but that the commissioners shall be invested with all the powers of the bank, and shall have power to sue and recover in the name of said bank for the use of the creditors. Ohio Rev. Stat. 132. This statute has been repeatedly enforced in their courts. It has been there decided that the corporation “cannot prosecute a suit after its dissolution, the right exists in the receivers and nowhere else. None but the receivers can sue in the corporate name. When they use that name as a party plaintiff, they must set forth sufficient to show the character in which they appear.” 13 Ohio, 270. That is, they must show the suit is for their use.
In another case they say, “ to give jurisdiction it is necessary to bring before the court as a party, the trustees or other persons named in the statute, having the legal charge of the assets of the dissolved corporation. Without this there can be no proceeding. A writ directed to a defunct corporation is a nullity.” Renick v. Bank West Union, 13 Ohio, 299. All this shows very plainly that in the opinion of that court, there was no continued existence of the corporation, and no necessity for it to carry out the purposes of the statute. The name alone remained.
When the right to sue is by the statute vested or continued in the corporate name, to be exercised by the trustees, it may rest upon the principle of assignment, as well as when the right of *572 suit is given to the trustees. In the one instance the legal right passes by the operation of law, in the other only the equitable right. In the one the trustees have the right to sue in their own name, in the other by virtue of the equitable assignment and the express provision of the statute, they have right to use the corporate name. And there is in this nothing more anomalous than in the use of John Doe, a mere non-entity, to recover in actions of ejectment, or of the name of a dead man to continue the prosecution of a suit brought for the use of a third person. In confirmation of this view, that these proceedings are in the nature of assignments, it may be stated that the practice in New York is to require the bank to make an assignment to the receivers, just as under some insolvent laws an assignment by the debtor is required ; under others the assignment is effected by operation of law.
But it is said, if the corporation be not continued there is a point of time, and it matters not how small, between the judgment of forfeiture, which is the moment of dissolution, and the transmission of the assets to the trustees, and in that brief space the whole debts are extinguished, and cannot be revived. We will meet this fairly. This position assumes that the judgment of its own force, and without execution operates a dissolution. I have endeavored to show that the authorities do not sustain this position, but I will now treat it as granted. The judgment of forfeiture and the appointment of trustees are intended tobe as nearly concurrent as possible. They are parts of the same transaction. Separate instruments are frequently connected together and made to operate as one. A deed to a husband, and a mortgage of the same estate to secure the purchase-money are regarded but as one instrument and defeat the wife’s claim to dower. In law fractions of a day are not usually regarded. The minutes of judgments and orders in the circuit courts are directed to be drawn up each day, by the clerk, to be read in open court, to be corrected when necessary, and then to be signed by the judge. A judgment cannot be considered as perfected until this is done, and if the proper entry is made, what the argument assumes to be done at separate intervals, in fact receives its effica *573 cy at one and the same instant. The lien of the judgment is by statute in this state directed to be from the time of entering such judgment; yet judgments entered on the same day are regarded as in all respects equal.
On authority the case of McLaren v. Pennington, 1 Paige R., already cited, has been shown to be against it. So is Crease v. Babcock, 23 Pick. 346. Mumma v. Potomac Company, 8 Peters, is also against it. There the charter of the old company had to be surrendered, and the surrender accepted before the new charter could take effect. Here was a brief interval; and the most minute, imaginable subdivision of time, it is said, will work the extinguishment. Yet there it was held, the obligation survived. But the case of the Atlas Bank v. Nahant Bank, 23 Pick. 480, establishes a principle which removes all doubt on this subject. It arose under the statute of Massachusetts in regard to corporations, which contains provisions very similar to ours. The injunction clause of that act, and the sixth section of our act, are in effect the same. In that case it was held, “ that the sequestration made by force of the statute, took effect not merely from the time of the appointment of receivers, but from the issuing of the injunction.” The necessary result of this is, that as soon as the receivers are appointed, they have a right to all the demands of the bank from the time of issuing the injunction, and it excludes all consideration of this ptmctum temporis, a point of time. This is in analogy to proceedings upon attachment and garnishment, which are but legal modes of assignment, and which, according to the settled law of this state, bind the estate from the time of their service. Indeed the constitutionality of this sixth section, can only be sustained, as I think, upon the ground that it does preserve the fund for the creditors, from the time of the issuing of the injunction.
If the principle be correct, that the trustees take as assignees under the appointment, it will scarcely be doubted, that there is that sort of privity between them and the bank debtors which will enable them to recover.
The variety of the statutory provisions in the several states on this subject, proves that their substance and effect have been *574 looked to, more than mere form. Neither the research of counsel, nor the investigation of the court, has brought to light a single case in which any one of such laws has been held to be unconstitutional. The case of Fox v. Horah, 1 Ired. Equity, only decided that, the case before the court did not come within their statute. The court commended the statute as wise and just, and calculated to exert a salutary influence. The case of The Bank v. The State, 1 Black., only held that the provisions attempted by the legislature, were too imperfect and incomplete to effect the object.- What these provisions were, is not shown in the report of the case, nor have I been able to find the act among the laws of that state. It seems only to have been a special act. The decision was made in 1823. The legislature at its next session passed a law, in principle like ours, transferring the assets to the state as a trustee, and authorizing suits in the name of the state or its assignee ; and their books of reports, so far as I have been able to trace, exhibit no further complaint or ojection to the law. The case in 2 Harrington, 8, arose under a special act of Delaware, passed two years after the charter of the Commercial Bank had expired, “ reviving the said bank with all its former powers, rights and privileges.” It was decided, that it was not the intention of the legislature to revive the debts due to or from it; and the court, with a good deal of parade, go on to say, that if such had been the intention of the law, it would have been unconstitutional. Neither of these positions has any direct bearing on the case before this court. The case holds that a corporation once dissolved, cannot, by a subsequent special law, be revived so as to revive the debts due to it; or rather it shows that would have been the decision, if the law had embraced the facts. On this point it stands directly opposed to the case already cited from 17 Serg. & Rawle, 65, and the doctrine laid down by Angell & Ames, 668, that, “ if a corporation be revived, all its rights and responsibilities are of course revived with it.” But it matters not now with us, which of these cases is right, because if this opinion establishes or proves anything, it is that before the dissolution of this bank, or at farthest simultaneously with it, the assets passed to the trus *575 tees. In support of these or similar provisions, are direct adjudications in some of the state courts, and the cooperation of the courts in all, where any question has arisen under them.
The policy pf this state has been very clearly indicated. The constitution provides, “ that no conviction for any offence shall work a forfeiture of estate.” Corporations may not be comprehended in this benign provision, yet it shows the spirit in which our government was framed. A series of acts, public .and private, for years before the enactment of this law of 1843, and extending also to a subsequent period, demonstrates the policy of the state on this subject. The policy, the feeling, and the intention of the legislature upon thi.s subject, cannot be mistaken. It is a settled rule of construction, that the courts are to carry out the intention, and give effect to.the policy of the legislature, if there be no constitutional obstacle, or controlling influence to prevent it. 1 Kent, 463. I can see nothing of that' kind in reference to the sections o.f this statute now under .consideration, and I conclude, in the language of the supreme court of Massachusetts, (18 Pick. 66,) that “ this is a just and wise remedial law, the object of which is to guard against the inequitable consequences of the common law rule, and ought to be liberally expounded.”.
The re-argument is refused-
Mr. Chief Justice Sharkey concurred.
Mr. Justice Thacker
delivered the .following ¡opinion on Jhe petition for re-argument:
The subject-matter of thjs controversy was fully stated in the opinion heretofore delivered by me on the first argument o.f this cause. For the reasons in that opinion stated, I fel,t it my duty to dissent from the judgment of the majority of the pourt in granting the .motion of the trustees of the Port Gribson Rank, to be made parties to this suit, and for leave to defend the same. The important consequences which must necessarily flow from any decision' made in this .canse have induced me to -re-examine with more than ordinary care, all ¡the authorities, relied upon by either party to sustain their respective positions.
*576 In all the discussion which this cause has elicted,.it has never been controverted that the judgment rendered by the circuit court against the Bank of Port.Gibson was that of a total forfeiture of all the franchises granted to the bank by its charter. The consequences which result from this judgment, under the statute of 1843, is the only matter in dispute. In the judgment heretofore rendered in this cause, it was decided that the common law consequences of such a judgment would have been to extinguish all debts due to the bank previous to its dissolution, but that, by virtue of the statute of 1843, such debts survived the dissolution of the corporation.
I will now proceed to examine the authorities relied on to sustain this view of the statute.
The great and leading case is that of Mumma v. The Potomac Company, 8 Peters R. 281. The first section of the charter of the Chesapeake and Ohio Canal Company, incorporated by the legislature of Yirginia, provides that “ so soon as the legislatures of Maryland and Pennsylvania, and the congress of the United States shall assent to the provisions of this act, and the Potomac Company shall have signified their assent to the same by their corporate act, a copy whereof shall be delivered to the executives of the several states aforesaid, and to the secretary of the treasury of the United States, there shall be appointed by the said executives and the president of the United States, three commissioners on the part of each state and the government of the United States,” whose duty it was made to open books of subscription for the capital stock of the company. The capital stock was six millions of dollars, divided into sixty thousand shares of one hundred dollars each. By the second section of the charter, it was provided that subscriptions for stock “ may be paid and discharged either in the legal currency of the United States, or in the certificates of stock in the present Potomac Company at the par or nominal value thereof, or in the claims of the creditors of the said company, certified by the acting president and directors to have been due for principal and interest on the day on which the assent of said company shall have been signified by their corporate act as herein- *577 before required.” By the thirteenth section of the same act, it is provided, “ that whenever the Potomac Company shall have declared its assent to the provisions of this act, in the manner herein before required, it shall be lawful for the said company to surrender its charter, and convey in due form of law to the Chesapeake and Ohio Canal Company, hereby incorporated, all the property, rights and privileges by them owned, possessed and enjoyed under the same ; and thereupon it shall be lawful to and for the said company, hereby proposed to be created, to accept such surrender and transfer, and to hold, possess, use and occupy all the said property, rights and privileges, in the same manner, and to the same effect as the said Potomac Company now hold, possess, and occupy the same by law; and thereupon the charter of the said Potomac Company shall be, and the same is hereby vacated and annulled, and all the rights and powers thereby granted to the Potomac Company, shall be vested in the company hereby incorporated.” By the twelfth section it was provided, “ that it shall be the duty of the president and directors of the Chesapeake and Ohio Canal Company so long as there shall be and remain any creditor of the Potomac Company, who shall not have vested his demand against the same in the stock of the Chesapeake and Ohio Canal Company, to pay to such creditor or creditors annually, such dividend or proportion of the net amount of the revenues of the Potomac Company, on an average of the last five years preceding the organization of the said proposed company, as the demand of the said creditor or creditors at this time may bear to the whole debt of one hundred and seventy-five thousand eight hundred dollars.”
From these provisions, it will be seen that the act chartering the Chesapeake and Ohio Canal Company, was not intended as an absolute law, but was a mere proposition to the parties therein named to become operative upon their joint acceptance of the same. The pleadings in the cause state that the legislatures of Pennsylvania a.nd Maryland, the congress of the United States and the Potomac Company, all accepted the terms of this charter, and the latter, by deed in due form of law, con *578 veyed all its property, rights, credits and previleges to the Chesapeake and Ohio Canal Company, which latter company accepted said conveyance and took possession of the property thereby conveyed.
This case has been strenuously relied on as sustaining the general principle that the debts due to a dissolved corporation survive such dissolution. I have been thus careful in the statement of the contents of the charter, in order to show that the dissolution of the Potomac Company could not and did not take place either by judicial forfeiture, nor by the expiration of its charter, but that the whole transaction was a matter of mutual contract and agreement by the parties thereto, which contracts and agreements were executed as conditions precedent to a voluntary surrender of its charter by the Potomac Company; and the reason why the obligations of that company survived its dissolution may be found in the fact that statutory provisions had been previously made and accepted, whereby the property of the Potomac Company was held responsible in the hands of the Chesapeake and Ohio Canal Company for the debts of the Potomac Company, according to the terms herein before set forth. The common law consequences of a dissolution were avoided by a voluntary assignment made by the Potomac Company of its assets for the benefit of its creditors, previous to its dissolution. By the very terms of the statute of Virginia, the dissolution of the Potomac Company could not take place until, by its corporate act, it had transferred “ all the property, rights and privileges by it owned, possessed and enjoyed,” under its charter.
The case decides nothing more than that a corporation, previous to its dissolution, may make an assignment for the benefit of its .creditors, and that after such assignment and subsequent dissolution, the creditors cannot maintain suit against the corporation so dissolved, although they have and can prosecute their lien created by virtue of the assignment upon the property assigned. The same principle was decided in the case of Lennox v. Roberts, 3 Wheat. 375, wherein an assignment in trust of its property was made by the Bank of the United States, a *579 short time previous to the expiration of its charter. The two cases are precisely similar in legal effect. The cases of The State of Maryland v. The Bank of Maryland, 6 Gill & Johns. 205; Pickstick v. Lister, 3 Mattie & Selw. 371; Goss v. Neal, 5 Moore’s R. 19; Rex v. Watson, 3 Price R. 6; Brewer v. Pitkin, 11 Pick. 829; Phenix v. Ingraham, 5 Johns. 112; Marbury v. Brooks, 7 Wheat. 565; and Robins et al. v. Embry, S. & M. Ch. R. 207, all sustain this principle, and I know of no case holding a contrary doctrine.
The case of Bleakney v. The Farmers and Mechanics Bank of Greencastle, 17 Serg. & Rawle, 65, has been relied on to show that the debts due to a corporation survive its dissolution. Upon an examination of this case it will be found that the charter of the Farmers and Mechanics Bank contained a provision that the bank should pay to the state six per cent, of its dividends, and that an. omission or neglect to do so, should be a cause of forfeiture of its charter. In November, 1819, the bank made a dividend without paying the six -per cent, on the same to the state, but no proceeding was instituted by the state to judicially ascertain the forfeiture, but, on the contrary, the state waived its right to the forfeiture by an act of assembly passed April 1st, 1822, entitled, an act for closing the concerns of banking institutions. Laws of Penn. 1822. On the 20th day of January, 1820, being two months after the failure of the bank to pay the state the six per cent, on the dividend of November, 1819, Bleakney made a note in favor of the bank for $1160, payable sixty days after date. On this note, on the 19th day of November, 1825, the bank brought suit against Bleakney. The latter insisted that the failure of the bank to pay six per cent, on the dividend of November, 1819, to the state, worked a dissolution of the charter, and that every note taken by the bank, after the first Monday of January, 1820, was therefore null and void. The court held that the bank could recover on the note. The pleadings in this case admit that the failure to pay the state the six per cent, on the dividend of November, 1819, was a cause of forfeiture; but*that cause of forfeiture had not been judicially ascertained. The state did not prose *580 Cute the batik for the cáuSe of forfeiture, but, on the contrary) passed a law by which she Waived her right of forfeiture. The batik therefore stood as if it had committed no act of forfeiture. It Was therefore hot trué in laW, as insisted by Bleakney, that the bank had forfeited its charter, the same not having been dissolved; The doctrine is weil established that á corporation is not to be deemed dissolved by: reason of any misuser of nonuser of its franchises; until the fault has been judicially ascertained and declared, even if the charter decláre that in default Of fulfilling the conditions, the corporation shall be dissolved. Héhce sUch a defence could hot be set up to an action of assumpsit upon á promissory note. Peter v. Kendall, 6 B. & C. 703; Slee v. Bloom; 5 Johns. Ch. R. 379; Wild v. Jenkins, 4 Paige C. R. 481; King v. Amery, 2 T. R. 515; 9 Wend. 382; 8 Ibid. 645; 6 Cowen, 26; 9 Cranch, 51; 4 Wheat. 698; 4 Mod. R. 53; 4 Gill & Johns. 121; 10 Ibid. 346; 1 Dev. & Batt. 306; 8 Greehleaf, 372; 24 Pick. 52; Angell & Ames on Corp. 129, 667; 2 Kent, 312.
The result of this cáse is, that if a corporation commit an act which is á cause of forfeiture, and the legislature subsequently waives its right of forfeiture, a debtor cannot set up Su'ch Cánse Of forfeiture in defence Of aii action 'afterwards brought by the corporation. No dissolution tof the Corporation having taken place, the effect of a dissolution upon the debts due a dissolved corporation was h'ot before the court, add no decision was made Upon that point.
Ih the case Of Lindell v. Benton & Kennerly, 6 Missouri R. 361, Liridell had Obtained a judgment against the Bank of Missouri, on which fieri jacid's issued, and was returned, no property found; wheréupbn Lindell issued a garnishment on the l8th day Of JUly-, 1837, against Thomas H. Benton 'and George H. Kehherly; as garnishees-, to answer such interrogatories as might be exhibited against them by the plaintiff touching their indebtedness to the Bank of Missouri. The right to this garnishment Was granted by a statute Of the state, the tenth sectidh Of Which provides, that “ from the time of making service of such garnishment) all moneys and effects due and owing, *581 payable or belonging' to such corporation, shall be bound until the judgment against the. corporation is satisfied.’-’ Digest of 1835, p. 126. The charter of' the bank expired by limitation on the 1st day of February,. 1838. The writ of garnishment was issued and served on the 18th day of July, 1837, being seven months previous to the expiration of the charter. During this seven months, the amount owed by Benton and Kennerly to the bank had been vested by operation of the statute in Lindell, who was the judgment creditor of the bank, and the garnisher of Benton and Kennerly, who were the debtors of the bank. Benton and Kennerly delayed answering the garnishment until after the 1st day of February, 1838, on which day the charter of the bank expired by limitation, and then moved the court to discharge the garnishees, because, at the date of said motion, there was no such corporation as the Bank of Missouri, and for other causes. The court overruled the motion, on the ground that the garnishment was not a suit between the bank and the garnishees, the interest of the bank having been vested by operation of the statute previous to the expiration of its charter, in Lindell, the plaintiff in the garnishment.
The case of Hubbard et al v. The Hamilton Bank, 7 Metc. R. 340, decides, that “ an attachment of the property of a bank, made before the bank commissioners applied for an injunction under the statute of Massachusetts, 1838, ch. 14, § 5, to restrain the bank from further proceedings with its business, was not dissolved by the subsequent appointment of receivers, pursuant to the provisions of that statute, to take possession of the property and effects of the bank.” The same principle has been decided in this state, in Oldham v. Ledbetter, 1 How. 43.
The two foregoing cases are both cases of judicial assignments of property and credits belonging to banks, which assignments took place previous to the dissolution of the corporations. Besides, they are cases of proceedings in rem, and in the case of Lindell v. Benton & Kennerly the batik was. not a party to the garnishment; and the case of Hubbard et al. v. The Hamilton Bank, proceeded upon the ground that a lien was acquired by virtue of the attachment against the property *582 of the bank, which lien was hot raised by the transfer of thé assets of the bank into the hands of the receivers. The effect of a dissolution of a corporation, whose property, rights, and credits had not been assigned -or lawfully disposed of previous to such dissolution, is hot ethbraced or adjudicated ih either of th'ese cases.
This concludes a review of th'e case's Which haV'e been relied oh to show that the debts due a ’corporation shrvive its dissolution. The case of The Lincoln and Kennebec Bank v. Richardson, 1 Greenl. Me. R. 79, I will presently examine in a different connection. Ih thé eáíse of Mumma v. The Potomac Company, there Was a voluntary assignment fot the benefit of the creditors, before ’dissolution of the 'corporation. In the case of Bleakney v. The Farmer's and Mechanics Bank, ho dissolution óc'cürrédi In the caSéS of Lindell v. Benton & Kennerly, and Hubbard et al. v. The Hamilton Bank, the plaintiffs had obtained liens upon the property of the banks, previous to dissolution 'or pto’cess agaitist them, and the dissolution ór procéss d'i'd ti'ot therefore raise the liens.
In the opinion Which T delivered ’on the former argument of this ’cause, I assum’ed the position that in o'rd’er to enable the trustees appo'ih'té'd !to take possession Of the as’sets óf thé Bank of Pói’t'Gibson, ánd tó collect the debts due the same, it tnust appear fróm the statute that the legislature had directed only 'a partial 'Seizure of the franchises of - the bank, that the privileges of holding property, -sUing hind being Sued, and ’of collecting and paying debt's, Were not to be seized into the hands óf the State, but tó be continued in the trustees directed to he appóinted; and'that if thoS'e frarichises, as well as the rest, Were directed tó become extinguished bg the judgment of forfeiture against the'(Corporation, it produced a total extinguishment of all the debts'due to and from the bank, So that neither the franchises of'the bank, ’nor thé pówér tó ’enforce its ’obligations, could be revived by legislafivé enactment, Or’the interposition of !a c’ourt of láw or equity.
'On the re-hearing it has been replied, that the législature has ho póWer to direct, ih cases of forfeiture, the seizure óf a por *583 tion of the franchises, and to continue the remainder, either iti the corporation, or in other hands, for the purpose of settling the affairs of thé corporation, unless the 'corporation signify its assent to such act of the legislature. In support of this position, the cases Of Foster et al. v. The Essex Bank, 16 Mass. R. 244; The Lincoln and Kennebec Bank v. Richardson, 1 Green 1. Me. R. 79, and the case of Crease v. Babcock, 23 Pick. R. 334, are relied upon mainly.
•In the case of Foster et al. v. The Essex Bank, it appears that the Essex Bank was incorporated to continúe from the 1st day of July, 1799, until the expiration of twenty years next following. Previously to the expiration of the charter, and Upon the 19th day of June; 1819, a general law Was passed, “ that all bodies corporate and politic, which now are, or hereafter may be established, and wbO'Se powers would expire, either by express limitation ill their charters of incorporation, or otherwise, shall be, and they hereby are eontinued bodies 'corporate and politic, for the term Of three years, from and after the day on which their powers would expire a's aforesaid, for the purpose of prosecuting and defending all 'suits, which noW are, or íháy hereafter be instituted, and of enabling such bodies 'corporate ahd politic gradually to Settle and 'closé their con'cerns, and divide their capital stock; but not for the purpose of continuing the business for which such bodies corporate and politic have be#r or may be established.” In April, 1819, being more than two months before the original charter expired, Foster brought suit against the Essex Bank for i$'5‘0,000. Between this time and the next term of the Court, the- original charter expired by limitation, but previously to such expiration, the statute, above quoted, continuing all corporations for three years from the period whé'n their dissolution would otherwise occur, had become a law. At -a subsequent ’term of the court, •in March, 1820, the counsel for the bank made the following suggestion :
“And now, William Prescott and Leverett Salto'nstall, Who were originally retained in this action by the ‘directors of -the Essex Bank, suggest that, since the last term of this court, the *584 corporation of the President, Directors and Company of the Essex Bank is dissolved by the expiration of the time limited for its duration, in the act of incorporation: which said act is dated the 18th day of June, A. D. 1799.
William Prescott,
Leverett Saltonstall.”
In the argument of this suggestion, the counsel for the bank insisted that the statute continuing the charter of the bank for three years beyond the period of its limitation by charter was unconstitutional and inoperative, unless the said statute was accepted by the bank, which had not been done. Messrs. Pickering and Daniel-Webster, as counsel for Foster, contended that the law was constitutional, and must be enforced, regardless of the acceptance or non acceptance of the bank. Chief Justice Parker, in delivering the opinion of the court, sums up his argument in the following language : “ Upon the whole, we cannot discern any principle by which it can be decided that this statute is void. It is not retrospective in the proper sense of that term; for it provides for a future existence.of the corporation, for limited and specific purposes. It does not infringe or interfere with any of the privileges secured by the charter, unless it be considered a privilege to be secured from the payment of debts, or the performance of contracts; and this is a kind of privilege which we imagine the constitution was not intended to protect. It does not impair the fqrce or obligation of contracts, but, on the contrary, provides a way of enforcing them, both in favor of, and against the corporation..... It was the incumbent duty of the legislature, to provide that corporations should not avoid their obligations by ceasing to exist, and the mode adopted in the act in question was certainly the most favorable. Had they provided that all corporations should cease to transact business three years before the time for which they were created expired, in order that they might bring their affairs to a close, it might justly be said that their privileges were taken away, and the grant of the government was impaired. But to provide for their continuance for such purpose, three years beyond their term, is no breach of *585 their privileges; and is, in fact, nothing more than establishing a mode by which their business may be closed, and their contracts carried into execution. It is in the nature of an administration upon their estate, and is only doing, in a more convenient form, what a court of equity, with competent powers, might do, viz. making the common fund answerable for the debts which were created on the credit of that fund. The suggestion filed in the case cannot have the effect to impede the progress of the suit.”
The sole question at issue in this Case, was the power of the legislature to continue a portion of the franchises of the bank for a period beyond the limit of its original charter, without the consent of the bank, for the purpose of collecting its assets, and paying its debts. The court decide that " it Was incompetent for such corporation to deny its existence, against a statute of the government, the object of which is to give a right of action on contracts, upon which they were legally and morally bound under their Charter.” The reason Of this rule is based upon the equity principle, that the capital stock of a bank is pledged for the payment Of its debts, and if the stockholders, divide this capital stock, leaving the debts of the bank unpaid, such division is fraudulent, and the funds divided become a trust fund in the hands of the stockholders for the 'benefit of creditors.
In the Casé of The Lincoln and Kennebec Bank v. Richardson, the court commenced their Opinion by Sáyifig: “ This case comes before us upOh an agreed statement Of facts, ahd was submitted without argument, on the ground that all the general reasoning in relation to the subject had been gone into in the case of Foster et al. v. The Essex Bank, which cause has recently been decided by the supreme judicial court of Massachusetts, and we are now merely called upon to decide whether the difference between the two cases as to some of the facts will vary the principles of law by which the case must be determined. There are only two points in Which the cases differ. In the Case before us, a bank is plaintiff; in the other, a bank was defendant; and in the present case, the act of June *586 1st, .1812, continuing the powers of this and other banks until the first Monday of October, 1816 ; and the second act for continuing or reviving the powers of banks, did not pass till December 14, 1816, more than two months after the first extending act had ceased to operate; whereas, in the other case, the extending act was passed some weeks before the expiration of the charter of the Essex Bank. We have examined the opinion of the court in the latter case, and are perfectly satisfied with their reasoning and conclusion, and we are of opinion that the same reasoning ought to govern both cases.”
After thus yielding their full assent to the opinion of the court in the case of Foster et al. v. The Essex Bank, they proceed to state the following apprehension: — “We apprehend that the same principle of law applies to an act continuing a charter beyond its original term, as to the act which granted the charter; that is, in both cases the grant or chartered powers must be accepted; because a charter, and the extension of it, are, till so accepted, inoperative; but when accepted, they become contracts. Nor do we perceive that, on this principle, it is of importance whether the extending act is passed before or after the expiration of the original charter. Acceptance is necessary in both cases.” This apprehension is not sustained by the opinion of the court in the case of Foster et al. v. The Essex Bank. In that case the extending act was passed before the expiration of the charter, and there was no acceptance of the extending act by the bank; and the court there decide that the extending act was valid, notwithstanding its non-acceptance by the bank. The power of a legislature to revive a corporation, after the expiration of the original charter, was not decided in the case of Foster et al. v. The Essex Bank; and the dictum of the court, in the Lincoln and Kennebec Bank v. Richardson, that the legislature, subsequently to the dissolution of a corporation, can revive the same with the consent of the corporators, so as to compel the debtors of the dissolved corporation, without their consent, to pay the debts which were extinguished by the dissolution of the original corporation, is unsustaina *587 ble by auy authority which I have been able to find, but, on the contrary, is opposed by the following authorities :
“If a corporation have been actually dissolved and extinct, it can never be revived; the charter must create a new corporation by words implying incorporation.” Wile, on Corp. 185.
“ When a corporation has completely ceased to exist, there is no ground for the theory of a continuance of the former corporation under a new name or capacity; it becomes altogether a new institution with newly created rights and privileges.” 2 Kent, 309.
In the case of the Commercial Bank v. Lockwood's Adm’r. 2 Har. Del. R. 8, the charter of the Commercial Bank, like that of the Lincoln and Kennebec Bank, expired by limitation. Subsequently to this expiration, the legislature passed an act for the purpose of reviving the corporation with all its previous powers. The bank accepted the act by bringing suit on a note due by Lockwood to the bank previous to the expiration of its charter. In the 'course of the opinion in that case, the court say, “ The Commercial Bank stood dissolved from and after the first day of March, 1830; the debt which is now sought to be recovered in this action became then extinguished. The legislative act of 1832, declaring the corporation to be revived and continued from the 1st day of March, 1830, with the same .powers, privileges, rights, and immunities, which had been granted to it by its original charter, will not enable it to sustain a suit for the debt in controversy, inasmuch as the design of that act was, not like letters patent of the king, to which we have referred, to renovate and set in motion a dormant or disabled corporation, but to revive and renew, or rather to recreate a corporation that had been for months absolutely dissolved, and civilly dead; and by the well settled principles of law, this debt was extinguished on the day of the civil death of the corporation, and all indebtedness and obligation on the part of the defendant were then legally at an end, and the debt could not be recreated, except in the same way that the original debt had been created, that is, by mutual agreement.”
A legislature has no power to revive a corporation actually *588 dissolved and extinct, whether the same occurs by limitation of charter or judicial forfeiture : but in cases where the use of the charter for some cause is merely suspended, the legislature may supply the defect, and thereby revive the corporation. Colchester v. Seaber, 3 Burr. 1866; Wilc. on Cor. 185; Rex v. Passmore, 3 T. R. 241, 242, 246; 2 Mason C. C. Rep., 44, 45, opinion of Judge Story; 1 Wharton R. 410.
Having shown that the dictum of the court in the case of the Lincoln and Kennebec Bank, that a charter of a bank may be revived after dissolution, is not sustained by authority, I will now present the main feature on which that case turned. After the passage of the act, which was supposed to have revived the dead corporation, the bank brought suit on a stock noto against Richardson, who was a stockholder to the amount of the note. The court declared that the bringing of this suit was an acceptance by the bank of the act of revival, and they further say, in the conclusion of their opinion, “if it should be urged, as it has been, that there is no assent on the part of the debtors of the bank to the extension of the charter, and that the bringing of this suit, though it may be proof of acceptance on the part of the bank, is not so on the part of Richardson; it may be replied, in addition to what has been before observed, that it appears by the agreement of the parties that the note in suit is a stock note, and of course Richardson isa stockholder. He is then bound by the act of acceptance on the part of the directors,— the bringing of this suit. The stockholders^re bound by their official acts, within the limits of their official duties.” The case therefore shows that the act of revival was not only accepted by the bank, who was the plaintiff in the action, but also by. the defendant, against whom the suit was brought. Had the suit been brought against a mere debtor to the dissolved corporation, who was not a stockholder, and who had not consented to the act of revival, there would then have been no foundation in law for the judgment of the court.
The case of Crease v. Babcock et al. shows that -the Chelsea Bank was incorporated in April, 1836, subject to the provisions of a general law of Massachusetts, which provided that the *589 holders of stock in any bank at the time when its charter shall expire, 'shall be liable in their individual capacities for the pay-, ment and redemption of all bills which may have been issued by such bank, and which shall remain unpaid, in proportion to the stock they may respectively hold. Rev. Stat. Mass. 312, sec. 31. By the 40th section of the same law, it was further provided that “ any committee, appointed by the legislature for the purpose, may examine into the doings of any bank chartered under the authority of this commonwealth, and shall have free access to all their books and vaults, and if upon such ex-aminátion. it shall appear, and after a hearing of said bank thereon, it shall be determined by the legislature that said bank has exceeded its powers or has failed to comply with any of the rules, restrictions and conditions provided by law, its charter may be declared forfeited.” By the revised statutes of the same state, c. 44, sec. 7, it was also provided that all corporations, whose charters shall expire or be annulled by forfeiture or otherwise, shall be continued bodies corporate for certain purposes therein mentioned. The object of this section is to authorize them to, collect their dues, to dispose of their property, to pay their debts, and to distribute their capital stock ; but not transact any business other than what is necessary to settle and close their concerns.
' Under these laws the Bank of Chelsea went into operation, and issued bills for circulation. On the 12th day of April, 1837, Crease presented for payment two bills of the bank for $1000 each. The bank refused to pay them. On the 20th day of April, 1837, the legislature, by virtue of the power reserved to it in such cases by the above statute, declared the charter of the 'bank dissolved. At the time of the dissolution, Babcock and others were stockholders of the bank. Crease then filed his bill against them, alleging the foregoing facts, and praying that the defendants might be decreed to pay the amount of the two bills held by him. The court decided that Crease was entitled to this remedy against the stockholders by virtue of the statute above quoted. Rev. Stat. Mass. 312, sec. 31. In giving its opinion in the cause,- the court recognizes the-continuance of the *590 corporation for certain limited purposes as the means by which the right to the remedy against the stockholders was preserved. The court say: “ When the charter is repealed, it has ceased to have force as a charter. It has expired. This is dissolution. The corporation derives no power from it. It cannot carry on business. It exists by virtue of the 7th section (set forth above) and that gives it force only for certain definite, specific, and limited purposes.....It has a nominal existence for the purpose of closing its concerns in the most convenient manner, and especially of compelling it to execute its contracts and discharge its obligations.” In this case, then, the legislature had reserved the power to annul the charter of the bank by legislative repeal and to compel the stockholders to pay its debts, and all persons contracting with the bank, did so knowing such to be the law. The case proves two things; 1. That the continuance of the corporation in a qualified and limited form was essential for the purpose of preserving and collecting its assets, and compelling it to discharge its own obligations, and 2, that an acceptance on the part of the bank was not necessary for such continuance.
Another point made is, that the power given to the trustees of the dissolved corporation effects an assignment of the assets of the corporation, by force of the statute. An assignment is defined to be the setting over or transferring the interest a man hath in anything to another. If the statute of 1843 operates as an assignment, the questions arise, who made the assignment? by what authority was such an assignment made ? and what estate does it convey ? Previously to the dissolution, the state had no interest in the assets of the bank, and subsequently to it, her interest reached only to the personal property of the corporation. If the statute constitute an assignment, the assignment was made by the state. The interest of the state in the assets of the bank, after dissolution, consisted of the personal property owned by the corporation at the time of the dissolution. To this extent, the assignment may be good. The state having no interest in the choses in action, nor in the real estate, could make no assignment of either. This statute is not analogous to ju *591 dicial assignments, for the reason that it creates no lien in favor of the trustees, on the assets of the bank previously to its dissolution. The legislature, having no interest in the property of the bank, before dissolution, could not create a lien upon it, either in its own fávor or that of others. A lien cannot be created by legislative enactment, but must result from judicial proceedings under such enactment.
It is also insisted, that the appointment of trustees is a part of the judgment against the bank, and that thereby the title to the property of the bank is transmitted to the trustees without the intermission of a point of time.
I cannot concur in this view of the statute. The court can pronounce judgment upon nothing save the matters of law and of fact, arising upon the information and the pleadings thereon. The question of law and fact, is the guilt or innocence of the bank on the alleged charges of forfeiture. If the bank deiúur to any charge, as being no lawful cause of forfeiture, the court decides the matter of law arising on the demurrer. If the bank take issue, the jury find the verdict. And if either the judgment of the court or the verdict of the jury be against the bank, the court renders a judgment of forfeiture thereon. The trustees are not parties to the information. If judgment should be in favor of the corporation, they could not be appointed. The provision of the statute is, that “ upon judgment of forfeiture,” &c., “ trustees shall be appointed,” &c. Independent of any reasoning upon the subject, the statute itself shows that the trustees could not be appointed until after the judgment of forfeiture has been rendered; and, consequently, if the appointment was made any time before the judgment was entered up and made final, it was void for want of statutory authority. The appointment of trustees is not a judicial act. The court has no discretion to appoint or not to appoint, but is positively directed by the statute to make an appointment in the event of judgment of forfeiture. This is the performance of a mere ministerial duty.
It is also insisted, that after judgment of forfeiture, an execution must issue thereon for the seizure of the franchises, and be executed before a dissolution of the corporation can take place.
*592 In the year-book of the 15th Edward IY. this rule is laid down: “ That Where it clearly appears to the court, that a liberty is usurped by wrong, and exercised on no titled either by the king’s grant or otherwise, judgment only of oustershall be entered. But that when it appears that the king or his ancestors have once granted a liberty, and the liberty is forfeited by misuser or nonuser, the judgment shall be, that it be seized into the king’s hands.” The reason given for the distinction is, that where the liberty or franchise has been usurped, the king cannot have that which never legally existed ; but in case of an abuser or misuser of a franchise once lawfully granted, the king reserves that which originally flowed from his bounty, and this course, in the latter case, it has been said, is most beneficial for the subject, who, though by forfeiture, mispleading or default, he may lose his liberty, may have recourse to the king’s mercy for restitution. 5 T. R. 551. When grants appear, but either the parties are incapable of taking, or their liberty of franchise granted is not allowable by law, the course has been to enter a mixed judgment, both of seizure and ouster. Sawyer’s Arg. Quo. War. 17; Co. Ent. 537 - 539, a.; Roll. R. 113. The foregoing authorities relate to informations against persons to whom some liberty had been granted and misused, and to corporators when the object of the information is not to dissolve the corporation, but to punish the corporator for an abuse of liberties. A judgment of seizure cannot be proper when a corporation is dissolved. 4 Mod. R. 58. In the case of Sir James Smith v. The City of London, Sir James sued out a mandamus to be restored to his place as alderman of the city, subsequently to the judgment of seizure against the mayor and aldermen of London. In speaking of the original judgment against the m'ayor and aider-men of London, the court say, “ By this judgment in the quo warranto, the corporation was not dissolved, for it doth neither extinguish or dissolve the body politic; but a corporation may be dissolved, for ’tis created upon a trust, and if that be broken ’tis forfeited ; but a judgment of seizure cannot be proper in such a ease, for if it be dissolved, for what purpose should it be seized 1” 4 Mod. R. 58. After judgment, a writ of seizure.is *593 sometimes issued to the sheriff, which commands him to seize the liberties into the hands of the king, but a writ of seizure only issues where there is properly a judgment of seizure, because the writ must necessarily follow the judgment. There is no rule of law better established, than that execution must follow the judgment.
These quotations from English authorities show that in cases of quo warranto there are four kinds of judgments, each depending upon the nature of the case presented by the information. If the information be against persons using a public franchise without color of title, the judgment is ouster, and no writ of seizure issues; if it be against persons having color of title, it is judgment of seizure, or judgment of seizure and ouster; if it be against the body politic or corporation itself, where there is no waiver of forfeiture, it is judgment of forfeiture, which produces a dissolution. 4 Mod. 58.
In the case of The State v. The Bank of South Carolina, 1 Spear’s R. 449, the circuit court says, “ It was said” (in argument at bar) “ that no judgment of forfeiture has ever yet been entered up and acted on by the courts. It is certain that no such form of judgment can be found. This fact, however, ad-, mits of explanation, and does not justify the conclusion that there can be no judgment of forfeiture. As the king or state must necessarily be a party to an information to ascertain and enforce a forfeiture, both have the right to waive the breach of any express or implied condition contained in a charter, and, I suppose, for like reason, may forbear to enforce a judgment upon such information. Such was the fact in the case against the City of London. The consequences of a judgment of forfeiture at common law, amounted, in effect, to confiscation of the property of the corporation. If the corporation were dissolved, the land which had been granted to it, reverted to the grantor, and the debts due to and from the corporation, could not be collected. Under such circumstances, the state might well pause in enforcing such a judgment.”
In Turret v. Taylor, 9 Cranch’s R. 43-51, Mr. Justice Story said, “ A private corporation, created by the legislature, may *594 lose its franchises by a misuser or a nonuser of them; and they may be resumed by the government under a judicial judgment, upon a quo warranto to ascertain and enforce the forfeiture. This is the common law of the land, and is a tacit condition annexed to the creation of every such corporation.” In the case of The State v. The Bank of South Carolina, above quoted, this authority is referred to and sanctioned, and the court further say, that “ all the doctrine connected with corporations, was fully discussed and considered in the cases of The King v. Amery, 2 T. R. 515, and The King v. Passmore, 3 T. R. 199, apd the judges seem to have taken it for granted, that corporations are liable to dissolution by judgment of forfeiture.”
In the case at bar an information was filed against the Bank of Port Gibson, under the statute of 1843, which is entitled “An act to prescribe the mode of proceeding against incorporated' banks for a violation of their corporate franchises, and against persons pretending to exercise corporate privileges under acts of incorporation, and for other purposes.” By the first section of this act, it is made the duty of the district attorney to file an information when he shall have reason to believe that - any incorporated bank, &c., within his district, has been guilty of a violation of any of the provisions of its charter, or has done or omitted to do any acts, the doing or omission of which would, in law, work a forfeiture of its charter. The eighth section of the same law provides for a “judgment of forfeiture against any bank or banks,” found guilty under the information authorized by the first section. According to all the authorities, a judgment of forfeiture against the body politic or corporation, dissolves that corporation, and in case of dissolution, there being nothing to seize, a writ of seizure cannot be issued. Such a thing as issuing a writ of dissolution is unknown to the authorities.
The doctrine is well settled that if several privileges are granted in a charter, and there is a forfeiture of the charter for an abuser of one of the privileges, quo warranto is brought and judgment upon it, this is a forfeiture of the whole charter. People v. The Bristol and Rensselaerville Turnpike Company, *595 23 Wend. 238, 239. (Cowen’s opinion, and authorities there cited.) It is equally well settled that such a forfeiture may be waived, in whole or in part, by the legislature. Many of the states of this Union have partially waived the rights of forfeiture against banks, by directing that the franchises of banking only be seized, and continue the corporation, with its remaining franchises, for the purpose of liquidation only. When such laws exist, the' corporation is not dissolved, and the proper judgment would be seizure of the franchises forfeited. In such cases execution may issue, because, the corporation being continued, there is a defendant in esse, against which the execution can run; but where the forfeiture is neither wholly nor partially waived, a judgment of forfeiture is a total and instantaneous dissolution of the corporation; and no execution could issue, because there would be no defendant in' esse, against whom it could run, and nothing to'seize, because of the dissolution. In the case of Mumma v. The Potomac Company, Judge Story says, “ There is no pretence to say that a scire facias can be maintained, and a judgment had thereon, against a dead corporation, any more than against a dead man.” It has frequently been decided, and in this state, that if judgment be had against a man, and he die before execution, no execution can issue against him.
The legislature of this state have neither wholly nor partially waived their right of forfeiture, but, on the contrary, have directed that, on proof of any act or omission which would in law work a forfeiture, a judgment of forfeiture shall be rendered against the corporation, the consequence of which is, as we have already seen, a total dissolution, and an extinguishment of all the rights and obligations of the corporation.
If it be true, however, that a writ of execution to seize the franchises must issue before the corporation can be dissolved, it may be remarked, that in the case of the Bank of Port Gibson, no such execution has been issued, as appears by the record, and consequently the corporation remains undissolved, and the trustees cannot be entitled to take possession of the assets, and prosecute this suit, until the title of the bank to do the same is *596 divested by the issuance and service of such execution. For this reason aione, then, the motion to substitute the trustees in the prosecution of the suit in place of the bank, cannot be sustained, and, if the court are right in that position, a rehearing of the case should be granted.
In the course of the voluminous and learned discussion which this cause has occasioned, much has been said of the hardship of the common law, in reference to dissolved corporations. A moment’s reflection will satisfy an unbiased mind that, if any hardship accrues to dissolved corporations, at common law, the fault is that of the corporations themselves, and not of the common law. By the common law is meant the unwritten laws of England, consisting of the general customs of the realm, communicated from the former ages to the present, solely by word of mouth. 1 Blac. Comm. Private corporations are created by written statutory enactments, and form no part of the common law; they are special and partial grants of liberties and powers to one or more persons, in derogation not only of the common law, but of the common rights of the people at large. Ang. & Ames on Cor. 41, 42. When the charter of the East India Company was under discussion in parliament, its opponents denounced it as an “ attack on the chartered rights of man and so it proved to be. The same might be said of the Bank of England, and of every bank that has ever been chartered in this country. In the United States, the common law right of private banking belongs to every individual, unless that right be prohibited by statutory enactment. In this country, eight hundred banks have been chartered, with a variety of powers, all of which were unknown to the common law, and therefore abridge the common law rights of the people to that extent. These corporations are artificial, invisible and intangible, existing only in contemplation of law by means of a written charter. Being unknown to the common or 'unwritten law, no rule or custom was established by that law with regard to their dissolution. Charters in England were granted either by the king or parliament, for certain specified purposes, and with limited or perpetual duration ; but they contained no pro *597 vision for an heir or legal representative, capable of inheriting their property in the event of dissolution. The common law of descents was therefore applied, whereby the personal property of the dissolved corporation escheated to the government, the real estate reverted to the grantor and his heirs, and the debts due to it and from it were extinguished. At common law, in England, on the death of a man, the debts due to him and from him were extinguished, because executors and administrators had no right of action until the 31 Eliz. 3. See Coke 2, 5 Inst. 404. In the United States, similar statutes exist, in avoidance of this common law rule. In this state, see H. & H. Digest, 393, § 27, 28, 412, § 88, by which rights to sue and be sued are given to executors and administrators. The same rules of descent which apply to the real and personal property of a dissolved corporation in England, prevail in all the states of this Union, with regard to the property of deceased persons. If a person die without heirs his property escheats to the government. If a grant of lands be made to hold during the life of the grantee, on the death of such grantee, the land reverts to the grantor and his heirs. With regard to natural persons, these rules are universally admitted to be just, but apply them to a corporation, and, we are told, an unpardonable sin is committed.
For the .foregoing reasons, in addition to the views submitted in my previous opinion in this case, I am still unshaken in the conviction that the statute of 1843, authorizing a judgment of forfeiture against incorporated banks, is not sufficient to avoid the common law consequences of such judgment of forfeiture ; but, on the contrary, so extinguishes all the franchises, privileges, rights and credits of the dissolved corporations, that the trustees, contemplated by the statute, can take nothing by their appointment, save the personal property of the corporation dissolved.
It has been with extreme reluctance that I have differed with the majority of the court on the questions involved in this important case; but, with my views of the law, I could not conscientiously do otherwise. The statute of this state provides that “ any *598 judge of this court, differing in opinion from a majority of said court, shall reduce his opinion to writing, and the reasons therefor, and shall file the same among the records of said court, and any judge of said court, neglecting or refusing to comply with the provisions of this section, shall be deemed guilty of a misdemeanor in office, and shall be liable to a removal therefor.” H. & H. 531, s. 5.